20662

SOUTHERN BELL TELEPHONE AND TELEGRAPH COM-
PANY, Appellant and Cross-Respondent, v. The PUBLIC SER-
VICE COMMISSION of South Carolina, and Daniel R. McLeod,
as Attorney General of South Carolina, Respondents and Cross-
Appellants, Midlands Welfare Rights Organization, Respondent.

(244 S. E. (2d) 278)

*Asst. Attys. Gen. Nathan Kaminski, Jr.*, and *Robert T. Bockman*, Columbia, *for respondent-cross appellant, The South Carolina Public Service Commission.*

*Atty. Gen. Daniel R. McLeod, Asst. Atty. Gen. Harry B. Burchstead, Jr.*, and *Staff Atty. James W. Johnson, Jr.*, Columbia, *for respondent cross-appellant, The Attorney General of South Carolina.*

*Robert Guild*, Columbia, *for respondent, Midlands Welfare Rights Organization.*

April 12, 1978.

LITTLEJOHN, Justice.

Southern Bell Telephone and Telegraph C o m p a n y (Southern Bell) [1], on July 1, 1976, made application to the South Carolina Public Service Commission (the Commission) for an increase in its monthly rates and charges for intrastate telecommunication services in South Carolina.[2] The proposed rate adjustments were to become effective on August 1, 1976, and would have produced additional annual gross revenues for Southern Bell's South Carolina operations [3] of $34,160,653.00, based upon the twelve month test period ending March 1, 1976. On July 7, 1976, the Commission ordered the proposed rates suspended for a period of six months from August 1, 1976 to February 1, 1977. Southern Bell, on July 16, 1976, filed an undertaking as permitted by § 58-9-550, Code of Laws of South Carolina (1976), and advised the Commission of its intent to place into effect $19,925,271.00 of the total proposed increase, subject to refund with interest at the statutory rate of 9%, should it ultimately be decided that any portion of the proposed increase placed into effect under bond was improper. This was done and these increased rates remain in effect pending the outcome of this appeal. Daniel R. McLeod, as

---

[1] Southern Bell is a wholly-owned subsidiary of American Telephone & Telegraph Co.

[2] Interstae rates are not here involved.

[3] Southern Bell operates in S. C., N. C., Ga. and Fla.

Attorney General of the State of South Carolina (the Attorney General), and Midlands Welfare Rights Organization intervened in opposition to the proposed rate increases.

After hearings on Southern Bell's petition, the Commission issued its order denying all requested rate adjustments. The Commission specifically held that the proposed rates, which would produce a return on common equity (common stock) of 16.45%, and an overall rate of return on Southern Bell's rate base of 11.29%, were unlawful and unreasonable. The Commission found that Southern Bell was earning 8.75% on common equity at the existing rates, which produced an overall rate of return on rate base of 7.73%. The Commission concluded that this return on the rate base was fair and reasonable, and that the return on common equity fell within a "zone of reasonableness" between 8% and 11%.

Thereafter, Southern Bell, pursuant to the provisions of § 58-9-1410 of the 1976 Code, commenced this action in the Court of Common Pleas for Richland County to vacate or set aside the Commission's order on the ground that it was unlawful, unreasonable and unconstitutional.

Section 58-9-1440, *Code of Laws of South Carolina,* (1976), provides as follows:

"Orders of the Commission may be reviewed by the court of common pleas upon questions of both law and fact."

Section 58-9-1450, *Code of Laws of South Carolina,* (1976), provides as follows:

"All orders of the Commission shall be deemed *prima facie* just and reasonable and in all actions and proceedings arising under this chapter or growing out of the exercise of the powers herein granted to the Commission the burden of proof shall be on the party attacking any order of the Commission to show that the order is unlawful or unreasonable."

The case came to be heard before the Honorable John Grimball, who, by his order dated March 31, 1977, reversed the Commission's order in part and remanded the case for reconsideration on three comparatively minor issues. Although the circuit court held that Southern Bell had failed to establish specific error as to the fair rate of return, the court found that the Commission's order contained error in three particulars: (1) the method of determination of the cost of short-term debt to Southern Bell; (2) the exclusion from the rate base of an expense to Southern Bell for annual wage increases; and (3) the exclusion of property held for future use from Southern Bell's rate base.

Southern Bell appeals from the order of the circuit court insofar as it failed to find error in the determination of a fair rate of return. The Commission and the Attorney General appeal from the circuit court's findings concerning the determination of Southern Bell's proper rate base.

At the outset, we recite the scope of the court's review of orders of the Public Service Commission: "In our consideration of the issues here presented the governing principle, well settled by many decisions of this Court, is that orders of the Public Service Commission issued under the powers and authority vested in it have the force and effect of law; that the Commission's findings of fact are presumptively correct and its orders presumptively reasonable and valid; that this Court cannot substitute its judgment for that of the Commission upon a question as to which there is room for a difference of intelligent opinion; and that, therefore, an order of the Commission such as is here involved will not be set aside except upon a convincing showing that it is without evidence to support or that it embodies arbitrary or capricious action as a matter of law." *Chemical Leaman Tank Lines, Inc. v. South Carolina Public Service Commission,* 258 S. C. 518, 189 S. E. (2d) 296 (1972).

We turn now to the specific questions raised by this appeal.

## FAIR RATE OF RETURN

Southern Bell charges error in the failure of the circuit court to conclude that the rates of return left intact by the Commission were unlawful, unreasonable and arbitrary. Southern Bell argues that the rates of return allowed by the Commission are so unreasonably low as to amount to confiscation, resulting in a taking of its property without due process of law. It is further argued that the rates of return were unsupported by substantial evidence, and that such low returns will not enable Southern Bell to preserve its financial integrity and attract new capital on reasonable terms. For these reasons, Southern Bell contends that the Commission's findings regarding what constitutes a fair rate of return to Southern Bell were arbitrary and capricious.

It is generally stated that "the governing principle for determining rates to be charged by a public utility is the right of the public on one hand to be served at a reasonable charge, and the right of the utility on the other to a fair return on the value of its property used in the service." 64 Am. Jur. (2d), *Public Utilities,* § 189.

The two leading cases from the United States Supreme Court setting forth the basic principles of utility rate regulation are *Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia,* 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923), and *Federal Power Commission v. Hope Natural Gas Co.,* 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944). In *Bluefield,* the Court stated:

"What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in

the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting the opportunities for investment, the money market and business conditions generally." 262 U. S. at 692-693, 43 S. Ct. at 679, 67 L. Ed. at 1182-1183.

In the *Hope Natural Gas Company* case, the United States Supreme Court stated:

"We held in *Federal Power Commission v. Natural Gas Pipeline Co.,* . . . that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its ratemaking function, moreover, involves the making of 'pragmatic adjustments' . . . . Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. . . . The ratemaking process under the Act, *i. e.,* the fixing of 'just and reasonable' rates, involves the balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that 'regulation does not insure that the business shall produce net revenues.' . . . But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on debt and dividends on the stock. . . . By that standard the return to the equity owner should be commensurate with returns on in-

vestments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 320 U. S. at 602-603, 64 S. Ct. at 287-288, 88 L. Ed. at 345.

The South Carolina Public Service Commission was created by the legislature to supervise and regulate the rates and services of every public utility in the state. § 58-3-10, *et seq.,* 1976 Code. In this capacity, the Commission sits as the trier of the facts, akin to a jury of experts. Findings of the Commission are presumptively correct under the statute quoted above. This Court has neither the expertise nor the authority to fix the rate of return to which a public utility is entitled. Even if we might have found a different rate of return to be fair and reasonable, such does not allow us to substitute our judgment for that of the Commission. Our scope of review of findings of the Commission is accordingly limited. We may not set aside an order of the Commission except on a convincing showing that it is without evidentiary support or that it is arbitrary or capricious as a matter of law. *Chemical Leaman Tank Lines, Inc. South Carolina Public Service Commission, supra.* In this regard, we quote approvingly from *State, ex rel. Utilities Commission v. General Telephone Company of the Southeast,* 281 N. C. 318, 189 S. E. (2d) 705 (1972).

"The weighing of the evidence and the drawing of the ultimate conclusion therefrom as to what return is necessary to enable a utility to attract capital is for the Commission, not the reviewing court. It has been said many times that this is so because the Commission is a body of experts 'composed of men of special knowledge, observation, and experience' in the field of rate regulation. . . . Without any intent to question the correctness of such statement as to the experience and abilities of the Commission to claim expertness for the courts, this is not the reason for the rule. The rule applies to the newly appointed, inexperienced commissioner,

sitting on his first general rate case, as truly as it does to the veteran and, should the veteran be transferred from a seat on a Commission to a seat on the reviewing court, he loses immediately the preferential status given by this rule to his views of the matter. The reason for that status is not expertness in fact, but the circumstance that the Commission is the delegatee of the power of the Legislature." 189 S. E. (2d) at 739.

Before the Commission reaches a decision it must weigh the testimony and all other evidence. It arrived at its findings and conclusions by discrediting a substantial portion of Southern Bell's evidence. The right to weigh the evidence submitted is peculiarly within the Commission's province. Evidence should be believed unless there is some reason for discrediting it. The Commission was undoubtedly in a better position to determine the credibility of the testimony because of their observation of the witnesses, than are we who must evaluate the testimony from a cold, printed record, the evidence is not of such quality or quantity that this Court feels compelled to say that the Commission should have accepted it.

Southern Bell, in argument, places emphasis on the fact that it is paying more than 8% interest on some long term bond issues. In April 1976 the rate paid was 8.37%. This is merely one item of the cost of capital, which is only one element of the cost of doing business. This lone item, in and of itself, does not prove confiscation as a matter of law.

We are of the opinion that the order of the Commission, insofar as it concluded that Southern Bell was entitled to a return on common equity between 8% and 11%, was supported by the evidence, and was neither capricious nor arbitrary.

Assuming, without deciding, that the rate of return allowed by the Commission is somewhat low, we cannot say that the rate of return is so low as to force

the conclusion that there is a deprivation of property without due process of law.

Inflation was a significant factor in bringing about the application for an increase in rates. It is an important element to be considered in determining whether periodic rate increases should be granted. The test year utilized ended approximately two years ago. We think it is inescapable that inflation has continued and is still continuing such that it may, within the foreseeable future, warrant a reevaluation of Southern Bell's rate structure. Whether or not such increase might be warranted is, of course, a matter about which we express no view.

We affirm the circuit court order insofar as it refused to vacate the Commission order denying the proposed rate increase.

In reaching the conclusion that Southern Bell was earning a return on common equity which fell within the 8% to 11% range, the Commission stated that Southern Bell could earn within the upper limits of this range through cost reductions and improved efficiency. Southern Bell excepted to this finding on the grounds that it was contrary to the evidence and completely unsupported by the testimony. We think that the Commission's observations were not improper and are worthy of note. The Commission constantly receives applications of this nature. It approved Southern Bell's applications for increases in 1971 and 1975. It has now concluded that there are areas in which Southern Bell can exercise cost-cutting measures. While the Commission did not specifically define these cost-cutting measures, we think this finding is reason for Southern Bell to reevaluate its operation. This exception is also overruled.

The remaining issues raised by this appeal deal with the question of what elements of property and finance should be considered in determining a correct "rate base" from which to decide a fair, just and equitable rate of

return to Southern Bell. The "rate base" is the amount of investment on which a regulated public utility is entitled to an opportunity to earn a fair and reasonable return. A public utility's "rate base" represents the total investment in, or the fair value of, the used and useful property which it necessarily devotes to rendering the regulated services.

## PROPERTY HELD FOR FUTURE USE

Southern Bell, in its application for rate adjustments, sought to have included in its rate base property which was not currently being used in the delivery of service. Southern Bell argued that this property had been purchased in advance of future needs in order that it might be acquired at a lower cost. We will refer to this as "property held for future use." The Commission disagreed with the inclusion of this property in Southern Bell's rate base, and decided that Southern Bell should not earn a return on this investment "until the property is actually employed in providing telephone service and it becomes 'used and useful'." The reason given for denying a return on property held for future use was that it encourages prudent and timely purchases on the part of the utility and protects the consumer from undue speculation. The amount of investment thereby excluded from Southern Bell's rate base was $345,000.00.

The circuit court found that this property had been purchased to fill specific needs, and that it was presently useful in providing telephone service. The circuit court concluded that the Commission had erred in excluding this investment from the computation of Southern Bell's rate base without first determining whether it was purchased to meet future needs, or for speculation. The Commission and the Attorney General except to the circuit court's holding.

Section 58-9-570 of the 1976 Code provides that, in determining just and reasonable rates, "the Commission shall give due consideration to the telephone utility's *property de-*

*voted to the public service . . .."* (Emphasis added.) Although the Commission has consistently excluded property which is held by a utility for use in the future from the utility's rate base, we believe that the better rule of law would be to require a factual determination regarding such parcel of property, rather than arbitrarily excluding all each property from the rate base. If it be determined that such property was purchased to serve a future utility purpose, it should be treated as "devoted to the public service," and included in the computation of the utility's rate base.

In *Re New England Tel. and Tel. Co.,* 99 P. U. R. (3d) 228, 232 (R. I. P. U. C., 1973), the Rhode Island Commission stated:

"We included property held for future use in the rate base because we consider it to be in the public interest that the company acquire, in reasonable amounts, property that is necessary to meet foreseeable service requirements of the public. Such acquisitions require capital, and to force the company, by a dogmatic policy of an automatic rate base disallowance to pass up opportunities to make prudent investments of this type can only be to the longrun disadvantage of the consumer."

In *Arkansas Louisiana Gas Co.,* 96 P. U. R. (3d) 219 (Ark. P. S. C., 1972), the Arkansas Commission stated:

"This Commission has been among the great majority holding that land held for future use may be included in the rate base by utilities, where the land will in the future serve a utility purpose. Management, not the Commission, should make decisions whether a local real-estate market is such that prudent businessmen acquire sites sooner rather than later."

We affirm the order of the lower court requiring the Commission to determine whether the "property held for future use," which Southern Bell sought to include in its rate base, was in fact bought in good faith for future utility use, or

bought for speculation. If bought for a future utility use, such property should then be included in Southern Bell's rate base.

## WAGE ADJUSTMENT

At the hearing before the Commission, Southern Bell proposed that an adjustment be made to its net operating income for increased wages in the amount of $3,720,276.00, which became effective August 1, 1976. The Commission refused to allow for this adjustment on the ground that it would not materially affect its decision. The lower court reversed, holding that it was error for the Commission to disallow this wage increase as a legitimate operating expense because it fell outside the test year. The lower court concluded that since the fact that Southern Bell would have to pay the wage increase was known to all of the parties throughout the test year period, it should properly be considered in the rate determinations. The Commission and the Attorney General except to this ruling.

We agree with the lower court that this wage adjustment should have been made to the test year data, since its effect was known and measurable at the time of the hearing. By the same token, we believe that the Commission should make any adjustments for known and measurable changes in expenses, revenues and investments occurring after the test year, in order that the resulting rates will reflect the actual rate base, net operating income, and cost of capital. Support for this conclusion is found in the case of *Mountain States Telephone & Telegraph Co. v. Public Utilities Committee*, 182 Colo. 269, 513 P. (2d) 721, 724-725 (1973), wherein it was stated:

"The relationship between costs, investment, and revenue in the historic test year is generally a constant and reliable factor upon which a regulatory agency can make calculations which formulate the basis for fair and reasonable rates to be charged. These calculations obviously must take into consideration in-period adjustments which involve known

changes occurring during the test period which affect the relationship factor. Out-of-period adjustments must be also utilized for the same purpose. An out-of-period adjustment involves a change which has occurred or will occur, or is expected to occur after the close of the test year. . . . Wages and salary increases which have been contracted for and which will take effect after the test year must also be analyzed in the process of calculations. . . .

"We agree that a blind adherence in this rate case to the relationship between costs, revenue and average investment in the historic test period without weighing the factors involved with proper in-period and out-of-period adjustments would be erroneous."

We conclude that the refusal of the Commission to consider this wage increase was arbitrary and capricious. Accordingly, we affirm the order of the lower court remanding the case to the Commission for reconsideration.

## COST OF SHORT TERM DEBT

In determining Southern Bell's cost of capital, the Commission determined the cost of short term debt to Southern Bell to be 5.72%. In making this determination, the Commission adopted the figure which was proposed by staff witness Hammond, without further explanation. Southern Bell argued before the lower court that the Commission had erred in the manner in which it determined the cost of short term debt. Southern Bell contended that the figure which the Commission adopted represented the cost of short term debt as of March 31, 1976, the last day of the test year period. Southern Bell argued that the Commission should have used the overall average of the high and low short term interest rates throughout the entire test year period. The lower court found for Southern Bell, and the Commission and the Attorney General filed exceptions.

It is unclear from the record how the Commission staff arrived at the 5.72% cost of short term debt which the Commission adopted. We agree, however, with the lower court's conclusion that if the cost figure represents the use of a "spot date", *i. e.* March 31, 1976, the acceptance of such figure would have been arbitrary and capricious.

In *Re General Telephone Co. of the Southeast,* 13 P. U. R. 4th 24 (S. C. P. S. C. 1976), the Commission acknowledged that due to the unique nature of short term debt instruments, a proper determination of the cost rate for short term debt involves consideration of numerous factors, such as the average prime rates over the test period, and compensating balance costs associated with bank borrowing.

We affirm the lower court's order remanding the case to the Commission for reconsideration of the cost of short term debt based upon that cost through the entire test year period and not as of any particular date.

As indicated hereinabove, the exceptions filed by the Attorney General and the Commission involve comparatively small amounts in the overall corporate structure of Southern Bell. The rulings are important as a matter of precedent in future hearings. It is obvious that the amounts involved are not sufficient to warrant a change in the rate issue.

In Summary, we hold that Southern Bell has not carried the burden of proof imposed upon it by § 58-9-1450 of the Code, quoted hereinabove. Accordingly, Southern Bell's exceptions are overruled. The case is remanded to the Court of Common Pleas for return to the Commission for additional determinations on the three issues raised by the exceptions of the Attorney General and the Commission. The exceptions of the Attorney General and the Commission are also overruled.

Affirmed.

Lewis, C. J., and Rhodes, J., concur.

Ness and Gregory, JJ., concur and dissent.

Ness, Justice (concurring and dissenting) :

I concur in that portion of the majority opinion as applies to "Property Held for Future Use," "Wage Adjustment," and "Cost of Short Term Debt." I dissent as to "Fair Rate of Return," and would reverse the trial court and remand to the Commission to determine this.

A regulatory body, such as the Public Service Commission, is bound by certain well established legal principles in discharging its duties in rate regulation. These principles have been developed from the relevant statutes and constitutional provisions and the cases interpreting them. Code of Laws of South Carolina, 1976, Title 58, Chapter 9; *Federal Power Comm'n. v. Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *Bluefield Water Works & Improvement Co. v. Public Service Comm'n. of West Virginia*, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923).

A regulatory commission has a responsibility to protect the customers of a utility from unwarranted, excessive or discriminatory charges on the one hand and, on the other, to deal fairly with a utility by allowing it to maintain rates which provide it with an opportunity to earn a reasonable return on the property which it has devoted to serving the public. Code of Laws of South Carolina, 1976, § 58-9-570.

The Commission must exercise this dual responsibility by:

(a) Not depriving investors of the opportunity to earn reasonable returns on the funds devoted to such use as that would constitute a taking of private property without just compensation.

(b) Not permitting rates which are excessive.

It is conceded that a utility commission may not make an arbitrary or capricious choice, *New England Tel. & Tel. Co. v. Public Utility Comm.*, 116 R. I. 356, 358 A. (2d) 1 (1976); its decision must be based upon evidence in the record, *Chemical Leaman Tank Lines v. S. C. Public Service Comm.*, 258 S. C. 518, 189 S. E. (2d) 296 (1972); it

cannot ignore established legal principles, *Duke Power v. Federal Power Comm.,* 130 U. S. App. D. C. 389, 408-10, 401 F. (2d) 930, 949-51 (1968); and its determination must be fairly set forth in findings which are adequate to enable a reviewing court to determine if its conclusions are supported in law, logic and fact. *United Tel. Co. v. S. C. Public Service Comm.,* 264 S. C. 212, 213 S. E. (2d) 738 (1975).

The "test year" in this case terminated on March 31, 1976, and it was necessary to make adjustments to the test period data to properly measure the prospective effect of the proposed rates. This the Commission failed to do. See *West Ohio Gas Co. v. Public Utilities Comm. of Ohio,* 294 U. S. 79, 55 S. Ct. 324, 79 L. Ed. 773 (1935). The rates, when they become effective, will only approximate the results they were designed to achieve.

This adjusted data is developed in three areas, to wit:

First, the investment of the utility is calculated in a set of figures known as the rate base. Next, the revenues and expenses are analyzed to determine the net operating income of the company. When that net operating income is divided by the rate base, the rate of return on rate base is derived, a critical item in any rate proceeding.

In judging the fairness and adequacy of this rate of return, the cost of the utility company's invested capital must be considered. A utility company's capital will generally consist of fixed obligations, such as bonds, preferred stock and short-term debt, and the investment of its stockholders which is the common equity of the company. To determine the cost of this capital, the cost of fixed obligations (bonds, preferred stock and short-term debt) is calculated and a reasonable return on the investment of the company's stockholders (common equity) must be established. These costs are combined to determine the company's overall cost of capital. The rate of return on rate base is then compared to the cost of

capital which has been established. If the rate of return on rate base is lower than the cost of capital, the rates must be adjusted upward by the Commission. It is on this basis that the general determination is made as to what rates are appropriate for utility service.

I believe the rates of return established by the Commission, and the rates resulting therefrom, are confiscatory and unsupported by substantial evidence; hence they are arbitrary, capricious, and unreasonable.

The two leading cases from the United States Supreme Court setting forth the basic principles of utility rate regulation are *Bluefield Water Works & Improvement Co. v. Public Service Comm'n. of West Virginia, supra,* and *Federal Power Comm'n. v. Hope Natural Gas Co., supra.* In *Bluefield,* the Court stated:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties." 262 U. S. 679 at 692, 43 S. Ct. at 679, 67 L. Ed. at 1182-83.

Subsequently, in the *Hope Natural Gas Co.* case, the United States Supreme Court expanded its prior definitions, and stated:

"From the investor or company point of view it is important that there be enough revenue not only for operating expenses but *also for the capital* costs of the business. These include service on the debt and dividends on the stock." 320 U. S. at 603, 64 S. Ct. at 288, 88 L. Ed. at 345. (Emphasis added.)

The rates established by a utility regulatory commission must not only provide the utility with the opportunity of

recovering its reasonable operating expenses, but must also provide a fair and reasonable return on the investments made by the company in providing utility service to its customers.

"The compensation which the Constitution guarantees an opportunity to earn is the reasonable cost of conducting the business. Cost includes, not only operating expenses, but also capital charges. *Capital charges cover the allowances, by way of interest, for the use of the capital,* whatever the nature of the security issued therefor; the allowance for risk incurred; and enough more to attract capital." *Missouri ex rel. Southwestern Bell v. Public Service Comm'n.,* 262 U. S. 276, at 291, 43 S. Ct. 544, at 547, 67 L. Ed. 981, at 986 (1923). (Emphasis added.)

While admittedly there is no set mathematical formula which can be applied in determining a fair rate of return, case law has established guidelines which may be used in determining whether the return approved by the Commission is reasonable. *E.g., Federal Power Comm'n. v. Hope Natural Gas Co., supra.* The Commission's order does not comport with any of these guidelines, and is therefore based upon a confiscatory rate of return findings.

The rate of return should:

(1) Be commensurate with returns on investments in other enterprises having corresponding risks; and

(2) Be sufficient to assure confidence in the financial integrity of the enterprise so as to enable it to maintain its credit and attract capital. *Federal Power Comm'n. v. Hope Natural Gas Co., supra.*

The Commission concluded an appropriate return for Southern Bell on its common equity falls within a zone from 8 to 11%. Tr. p. 939. The record demonstrates the unreasonableness and inequity of such a finding. Even the upper levels of this zone are unreasonable and unlawful, and the conclusion results from the Commission's total rejection of all of the Company's testimony, including evidence of com-

parable earnings. The Commission placed its entire reliance for support of its 11% upper limit upon techniques which it recognized in its Order required further refinement. (Tr. p. 932).

The lower level of the Commission's zone of reasonableness is even more contrary to the evidence and, in fact, not only lacks evidentiary support but results in confiscation. *None* of the expert witnesses in direct testimony even considered returns on equity at the lower levels adopted by the Commission. The experts who testified for the Company all supported returns on equity at or above 14%. (Tr. pp. 152, 224, 284). The *two experts presented by the Commission* staff discussed returns of *10.45%* and of "something *below 13%*" respectively. (Tr. pp. 900-909, 769-78). The lower limit of the range of reasonableness established by the Commission at 8% was mentioned on the record only by a rebuttal witness for Southern Bell, who indicated the *manifest unreasonableness* of such a figure. In testifying as to the inevitable result of setting the allowable return on equity at as low as level as 9.24%, this expert witness stated:

The stock would sell far below book value, and the Company would be unable to sell equity capital on any reasonable basis. In addition, its interest coverage ratio would decline, and this would lower its bond ratings and impair its ability to raise debt capital." Tr. p. 853.

Thus, the only expert testimony in the record relevant to the lower level of return approved by the Commission specifically establishes that the very standards outlined in the *Hope* case for avoiding confiscation would be violated by such a return.

The 8% rate of return found by the Commission to be within the range of reasonableness falls *below* the Company's current cost of *long-term debt*. Southern Bell's latest bond issue on the record, made in April, 1976, was at a cost to the Company of 8.37%. (Exhibits Vol. I, Table 11, Rseponse to Data Request No. 1, at p. 7.)

Not only is the rate of return established by the Commission below the Company's current cost of long-term debt, but it is drastically *lower* than the returns consistently found reasonable by the Commission in its *three previous rate decisions* concerning Southern Bell, spanning 1971 to 1975. S. C. P. S. C. Orders No. 15, 962 [93 P. U. R. (3d) 76 at 84 (1971)]; No. 17,302 [3 P. U. R. 4th 406 at 410-411 (1973)], and No. 18,474 [10 P. U. R. 4th 166 at 174 (1975)]. See, 31 C. J. S. Evidence § 41 p. 991 (1964); *Colorado Kenworth, Inc. v. Archie Meek Transp. Co.,* Wyo., 495 P. (2d) 1183 (1972). In each of those three decisions, the Commission concluded a return of *12%* was appropriate and reasonable for Southern Bell in South Carolina. While recognizing the Commission is not bound by its prior decisions, and it may re-examine and alter its previous findings as to reasonableness when conditions warrant, the present return is a radical departure from those levels of earnings previously established and is not only unexplained but also completely contrary to current economic fact.

In *Southern Union Gas Company v. New Mexico P. S. C.,* 84 N. M. 330, 503 P. (2d) 310, 313 (1972) the court held:

"[I]n the preceding cause between the same parties, Cause No. 31074, *supra,* the cost of capital was actually used as the rate of return . . . [T]here was no evidence of changed circumstances which would justify a departure from previous Commission procedure . . . Although a Commission should be able to change its procedure, it should not arbitrarily or capriciously do so without good reasons."

The Commission's unwarranted and drastic reduction in its previously approved returns for the Company completely ignores the continuing inflation and increased costs of doing business which confront the Company. Recently, the Massachusetts Supreme Court held that, at an absolute minimum, the telephone Company must be allowed a rate of return of 13%. In its opinion, the Court stated:

"In substance, [the Commission made] an assumption that there will be no inflation. That assumption is not only speculative and uncertain; it is clearly erroneous . . . In view of what we say as to cost of equity capital, moreover, it seems clear that the error has resulted in confiscation." *New England Tel & Tel. Co. v. Dept. of Public Utilities, Mass.,* 354 N. E. (2d) 860 at 865 (1976).

The *Commission has not explained* its departure from its prior findings of *12% as a reasonable return on equity capital.* In fact the record conclusively reveals that the *Company has not been able to earn the returns previously approved by the Commission because of inflation and erosion. E.g.* Tr. p. 421.

The "comparable earnings test" to which the Commission in its 1975 order gave primary emphasis, reveals what an investor can earn in various alternative investments with comparable risks. Although the Commission had applied these tests in 1971 and 1975, it completely abandoned the comparable earnings measurement here and rejected all of the testimony concerning what businesses of like risk were earning during relevant periods. Moreover, it did not articulate the reason for this major change in regulatory policy. The general rule concerning the error of such a departure has been stated as follows:

"[A]dministrative bodies are not ordinarily bound by their prior determinations or the principles or policies on which they are based. However, prior determinations are entitled to great weight . . . and radical departures from administrative interpretations consistently followed cannot be made except for most cogent reasons." 73 C. J. S. Public Administrative Bodies and Procedure § 48, p. 482. [See, *e. g., New England Tel. & Tel. Co. v. Dept. of Public Util., supra,* 354 N. E. (2d) at 871.

Under the Commission's Order, Southern Bell cannot preserve its financial integrity and attract new capital on rea-

sonable terms. The rate of return on equity capital authorized by the Commission is at or below the current interest rate paid by the Company on long-term debt.[1]

Even the majority opinion implies this by stating:

"Assuming, without deciding, that the rate of return allowed by the Commission is somewhat low . . ."

"We think it is inescapable that inflation has continued and is still continuing such that it may, within the foreseeable future, warrant a re-evaluation of Southern Bell's rate structure."

I conclude the Commission's Order is unlawful and unreasonable. I would reverse the trial court in this respect and remand.

GREGORY, J., concurs.

---

[1] Southern Bell's latest bond issue on the record, made in April, 1976, was at a cost to the Company of 8.37%. (Exhibits Vol. I., Table 11, Response to Data Request No. 1, at p. 7).