333 S.C. 12 (1998)
507 S.E.2d 328
Philip S. PORTER, Consumer Advocate for the State of South Carolina, Respondent/Appellant,
v.
SOUTH CAROLINA PUBLIC SERVICE COMMISSION and BellSouth Telecommunications, Inc., of which South Carolina Public Service Commission is Respondent,
and BellSouth Telecommunications is Appellant/Respondent.
South Carolina Public Communications Association, Petitioner,
v.
South Carolina Public Service Commission and BellSouth Telecommunications, d/b/a Southern Bell Telephone and Telegraph Co., of which South Carolina Public Service Commission is Respondent,
and BellSouth Telecommunications is Appellant/Respondent.
No. 24847.
Supreme Court of South Carolina.
Heard October 8, 1998.
Decided October 26, 1998.
*17 Caroline N. Watson, Robert A. Culpepper, Harry M. Lightsey, III, and William F. Austin, all of Columbia, and John Hamilton Smith of Charleston, for BellSouth Telecommunications, Inc.
Philip S. Porter, Nancy Vaughn Coombs, and Elliott F. Elam, Jr., all of Columbia, for Consumer Advocate for the State of South Carolina.
F. David Butler, of Columbia, for South Carolina Public Service Commission.
*18 WALLER, Justice:
This is a utility rate case. We affirm in part and reverse in part.

PROCEDURAL POSTURE
The South Carolina Public Service Commission (PSC) reviewed BellSouth Telecommunication's (BellSouth's) earnings in 1994, a test year used to determine future rates. Based on that review, PSC adjusted certain revenues and expenses of BellSouth and ordered the company to reduce its future rates by $42.3 million annually. Philip S. Porter (Consumer Advocate) filed a petition for review of PSC's orders in circuit court. The circuit court affirmed PSC's orders with the exception of one issue, which the circuit court reversed. Consumer Advocate and BellSouth now appeal the circuit court's judgment.
ISSUES
1. Did the circuit court err in affirming PSC's decision on the rate of return on common equity?
2. Did the circuit court err in affirming PSC's calculation of BellSouth Advertising and Publishing Co. revenue?
3. Did the circuit court err in affirming PSC's treatment of cash working capital?
4. Did the circuit court err in affirming PSC's decision on the annualization of salary and wage expenses?
5. Did the circuit court err in reversing PSC's decision to include Area Plus losses in test-year calculations?

1. RATE OF RETURN ON COMMON EQUITY
Consumer Advocate contends the circuit court erred in affirming PSC's decision on the rate of return on common equity because that decision was not adequately documented in findings of fact or supported by substantial evidence. We agree.
*19 A PSC staff economist testified PSC should set the rate of return on common equity[1] between 11.5 percent and 12 percent. An economist hired by Consumer Advocate testified PSC should set the rate between 10.4 percent and 11.6 percent. In calculating the rate, both economists compared BellSouth with other telephone companies. They did not include "flotation costs" associated with issuing stock because BellSouth Telecommunications, a subsidiary of the publicly held BellSouth Corp., had no plans to issue stock. An economist hired by BellSouth testified PSC should set the rate between 13.71 percent and 13.95 percent. In calculating the rate, BellSouth's economist compared the company with non-regulated, non-utility companies such as McDonald's Corp., Procter & Gamble Co., Knight-Ridder Inc., and Pfizer Inc. He also included flotation costs associated with issuing stock.
In Order No. 95-1757, PSC set the rate of return on common equity at 12.75 percent, finding that rate to be "fair and reasonable" to BellSouth, the company's stockholders, and the company's customers. PSC described the three economists' testimony and outlined established legal principles the agency must use in determining a fair rate of return. PSC agreed with its staff economist and Consumer Advocate's economist that "telecommunications companies are a better comparison group with BellSouth than the various non-utility surrogates favored by [BellSouth's economist]." PSC also agreed it would be improper to include costs of issuing stock in calculations in this case. PSC stated its decision was based on "evidence presented by the witnesses and current economic conditions."
Consumer Advocate in a petition for rehearing urged PSC to set the rate no higher than 12 percentthe highest estimate recommended by the two economists upon which PSC relied in its order. In response, PSC issued Order No. 96-75, *20 deleting from its previous order the above sentence in which it agreed with the two economists about the proper comparison group. PSC concluded the 12.75 percent rate was proper because it fell within the overall range recommended by all three economists (10.4 percent to 13.95 percent).[2] The circuit court affirmed PSC's order.
Consumer Advocate now contends PSC issued orders without properly explaining its reasoning in findings of fact based on substantial evidence in the record. Consumer Advocate argues PSC offered no rationale for its decision after modifying the original order to delete any reference to its reliance upon the two economists' testimony.
This Court employs a deferential standard of review when reviewing a PSC decision and will affirm that decision when substantial evidence supports it. Heater of Seabrook, Inc. v. Pub. Serv. Comm'n of South Carolina, 324 S.C. 56, 60, 478 S.E.2d 826, 828 (1996); Hamm v. South Carolina Pub. Serv. Comm'n, 309 S.C. 282, 422 S.E.2d 110 (1992). This Court may not substitute its judgment for PSC's on questions about which there is room for a difference of intelligent opinion. Because PSC's findings are presumptively correct, the party challenging a PSC order bears the burden of convincingly proving that the decision is clearly erroneous, or arbitrary or capricious, or an abuse of discretion, in view of the substantial evidence on the whole record. Heater of Seabrook, Inc., supra; Patton v. South Carolina Pub. Serv. Comm'n, 280 S.C. 288, 290, 312 S.E.2d 257, 259 (1984); S.C.Code Ann. § 1-23-380(A)(6) (Supp.1997).
Substantial evidence is relevant evidence that, considering the record as a whole, a reasonable mind would accept to support an administrative agency's action. Substantial evidence exists when, if the case were presented to a jury, the court would refuse to direct a verdict because the evidence raises questions of fact for the jury. It is more than a mere scintilla of evidence, but is something less than the weight of *21 the evidence. Furthermore, the possibility of drawing two inconsistent conclusions from the evidence does not prevent a court from concluding that substantial evidence supports an administrative agency's finding. Hamm v. South Carolina Pub. Serv. Comm'n, 315 S.C. 119, 122, 432 S.E.2d 454, 456 (1993); Lark v. Bi-Lo, Inc., 276 S.C. 130, 135, 276 S.E.2d 304, 307 (1981).
This deferential standard of review does not mean, however, that the Court will accept an administrative agency's decision at face value without requiring the agency to explain its reasoning. In determining a fair rate of return on common equity, for example, PSC must fully document its findings of fact and base its decision on reliable, probative, and substantial evidence on the whole record. Porter v. South Carolina Pub. Serv. Comm'n, 332 S.C. 93, 504 S.E.2d 320 (1998); S.C.Code Ann. § 58-5-240(H) (Supp.1997).
"An administrative body must make findings which are sufficiently detailed to enable this Court to determine whether the findings are supported by the evidence and whether the law has been applied properly to those findings." Porter, supra; Hamm v. South Carolina Pub. Serv. Comm'n, 309 S.C. 295, 422 S.E.2d 118 (1992); S.C.Code Ann. § 58-9-1160 (1976). "Where material facts are in dispute, the administrative body must make specific, express findings of fact." Porter, supra; Able Communications, Inc. v. South Carolina Pub. Serv. Comm'n, 290 S.C. 409, 351 S.E.2d 151 (1986); S.C.Code Ann. § 1-23-350 (1986). An administrative agency is not required to present its findings of fact and reasoning in any particular format, although the better practice is to present them in an organized and regimented manner. However, "a recital of conflicting testimony followed by a general conclusion is patently insufficient to enable a reviewing court to address the issues." Able Communications, Inc. v. South Carolina Pub. Serv. Comm'n, 290 S.C. at 411, 351 S.E.2d at 152.
We find the order in this case deficient because PSC made no findings of fact or offered any explanation of its conclusion. See S.C.Code Ann. § 58-9-570 (1976) (listing factors PSC must consider in determining just and reasonable rates of telephone companies). PSC's order simply recites the economists' conflicting testimony, mentions established legal principles *22 applied in rate cases, and then Concludes 12.75 percent is a proper rate of return on common equity. PSC eliminated what little reasoning it had included in its original order by deleting any reference to the two economists' opinion. See also Hamm v. South Carolina Pub. Serv. Comm'n, 309 S.C. at 287, 422 S.E.2d at 113 (PSC's decision to set rate of return on common equity at 13.25 percent was not supported by substantial evidence where evidence showed that maximum rate, after inappropriate adjustments were deleted, was 13 percent). Accordingly, we reverse the judgment of the circuit court on this issue.[3]

2. BAPCO REVENUE
Consumer Advocate argues the circuit court erred in affirming PSC's decision on the amount of revenue generated by BellSouth Advertising and Publishing Co. (BAPCO) because that decision was not adequately documented in findings of fact or supported by substantial evidence. We agree.
BAPCO, a subsidiary of BellSouth Telecommunications, handles Yellow Page operations. PSC previously had determined *23 that it would recognize the net income of BAPCO as operating revenue and that it would recognize the BAPCO investment in the rate base. PSC's staff recommended that BellSouth's operating income from the test year include about $6 million from BAPCO operations. Consumer Advocate presented testimony showing that figure was abnormally low during the test year due to certain nonrecurring accounting adjustments made by BellSouth in December 1994. BAPCO's average net income was about $551,000 per month except for December, when it reported a loss of $25,000. BellSouth itself described the December expenses as "extraordinary," and said they resulted from the downsizing of the work force and planned technological improvements, among other things, according to Consumer Advocate. BAPCO revenue ought to be set at $6.6 million, Consumer Advocate argued.
PSC adopted the staff recommendation, concluding it was accurate and reliable. In its order upon reconsideration, PSC explained that it rejected Consumer Advocate's position because it was based upon "pure speculation," not proof that BellSouth's accounting adjustments actually were nonrecurring. The circuit court affirmed PSC's decision.
We conclude the circuit court erred in affirming PSC's decision on this issue for two reasons. First, the record does not contain substantial evidence supporting PSC's conclusion that Consumer Advocate's position was "pure speculation." The operating loss in December, which followed eleven months of profits, indicates that month was somehow unusual. BellSouth itself described the December 1994 expenses as "extraordinary" and explained they were related to downsizing of the work force and technological improvements, among other things. The only conclusion that can be drawn from the record is that those expenses were nonrecurring. See Hamm, 315 S.C. at 122, 432 S.E.2d at 456 (substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).
Second, PSC must adjust atypical test-year figures in order to accurately perform calculations that affect the company's overall rate of return and, ultimately, customer rates. See Hamm, 309 S.C. at 289-90, 422 S.E.2d at 114 ("object of test year figures is to reflect typical conditions .... Where an unusual situation exists which shows that the test year figures *24 are atypical and thus do not indicate future trends, the Commission should adjust the test year data"); see also S.C.Code Ann. § 58-9-570 (1976) (in determining rates, PSC shall consider, among other things, reasonable operating expenses and other costs necessary to provide the service, as well as other matters PSC may find necessary); Chesapeake Utilities Corp. v. Delaware Pub. Serv. Comm'n, 705 A.2d 1059, 1067 (Del.Super.Ct.1997) (extraordinary expenses are included in rate base only if they are a recognized component of the rate base or if the commission, in its discretion, determines that denying them would impair a utility's effective operation). Accordingly, we reverse the judgment of the circuit court on this issue.

3. ALLOWANCE FOR CASH WORKING CAPITAL
Consumer Advocate contends the circuit court erred in affirming PSC's treatment of cash working capital because that decision was arbitrary, capricious, and not supported by substantial evidence. We agree.
Cash working capital is money a utility must have on hand to pay its own bills before it receives payments from customers. Consumer Advocate argued PSC should use a lead-lag study prepared by BellSouth to determine how much cash working capital to include in BellSouth's rate base.[4] Such a study shows whether a company is able to pay its own bills before receiving revenue from customers by comparing the revenue lag (days between company's provision of service and customers' payment) with the expense lag (days between the incurring of an expense by company and payment of the expense).[5]
Consumer Advocate presented testimony showing PSC should set BellSouth's allowance for cash working capital at *25 zero because the company bills most of its customers for services in advance. BellSouth has a negative cash working capital requirement, Consumer Advocate contended. Simply put, customer revenue flows into BellSouth's accounts before it must pay expenses. Therefore, BellSouth needs no allowance for cash working capital and it is inappropriate to allow shareholders to earn a return on that money by including it in the rate base, Consumer Advocate argued.[6]
PSC rejected Consumer Advocate's position, instead adopting its staff's recommendation to include an allowance for cash working capital of $10.4 million in BellSouth's rate base. PSC's staff based its calculations on a method that uses a company's average daily cash balances to determine the requirement. In its orders, PSC stated it had long used such a method and believed it to be appropriate in this case. Companies must have cash on hand for daily operations and there is no such thing as a "negative cash working capital requirement," PSC stated. PSC considers cash working capital to be an investment made by shareholders upon which they are entitled to earn a return. PSC also concluded the lead-lag method penalizes good cash management and rewards inefficient cash management. The circuit court affirmed PSC's decision.
Consumer Advocate now contends PSC's decision was arbitrary, capricious, and not supported by substantial evidence. In some states, courts have approved a regulatory agency's decision either to establish a negative cash working capital requirement and deduct it from the rate base, or set the requirement at zero.[7] In others, courts have upheld a regulatory *26 agency's decision to include an allowance for cash working capital in the rate base, although it usually is limited to investor-supplied capital.[8]
It is within PSC's discretion to adopt the rate-setting method it believes is appropriate, provided that method complies with the statutes. See Heater of Seabrook, Inc., 324 S.C. at 64, 478 S.E.2d at 830 (PSC generally has wide latitude to determine an appropriate rate-setting methodology); Nucor Steel v. South Carolina Pub. Serv. Comm'n, 312 S.C. 79, 85, 439 S.E.2d 270, 273 (1994) (nothing in statute requires PSC to adopt any particular price-setting methodology in determining fair rate of return). As an Arkansas court stated, as long as a regulatory agency operates within the statutes, "[i]t is apparent that no particular methodology is precise and ... a determination of working capital is in many respects an exercise of discretion as to what particular method yields the most fair and equitable result in each case." General Tel. Co. v. Arkansas Pub. Serv. Comm'n, 23 Ark.App. 73, 744 S.W.2d 392, 397 (Ark.Ct.App.), aff'd, 295 Ark. 595, 751 S.W.2d 1 (1988).
We conclude the circuit court erred in affirming PSC's decision on this issue because the record does not contain any *27 testimony or other substantial evidence supporting PSC's conclusion. PSC decided the issue arbitrarily, adhering to its past practice and simply announcing BellSouth is entitled to an allowance for cash working capital in its rate base without attempting to explain or support that decision. See Hamm, 309 S.C. at 289, 422 S.E.2d at 114 (a previously adopted policy may not furnish the sole basis for PSC's action). PSC made no effort to explain or support its conclusion that the lead-lag method penalizes good cash management and rewards inefficient cash management. In addition, PSC's statement that there is no such thing as a negative cash working capital requirement is simply incorrect. Other regulatory agencies and courts have discussed and applied the concept. E.g., Colorado Mun. League, 687 P.2d at 419 (explaining that positive working capital is provided by shareholders, while negative working capital is provided by advance customer payments or other funds received before a company's own bills are due); Barasch v. Pub. Util. Comm'n, 108 Pa.Cmwlth. 326, 530 A.2d 936 (Pa.Commw.Ct.1987) (same); cases cited in footnote 7. In short, PSC's arbitrary pronouncement stands in stark contrast to the debate engaged in by regulatory agencies and courts in other states on this issue. Accordingly, we reverse the judgment of the circuit court on this issue.

4. WAGE AND SALARY EXPENSES
Consumer Advocate contends the circuit court erred in affirming PSC's decision on the annualization of salary and wage expenses because that decision was not adequately documented in findings of fact or supported by substantial evidence. We disagree.
BellSouth reduced the number of employees after the end of the 1994 test year due to reorganization, technological advances, and corporate "downsizing." PSC's staff examined BellSouth's salary, wage, and payroll tax expenses from March to May 1995, the most recent available when the staff calculated the reduction in those expenses. A PSC accountant testified the calculations did not include more recent actual reductions in the work force because the staff preferred to use actual, audited figures.
When PSC heard the case, Consumer Advocate argued the agency should examine more recent data for May and June *28 1995, which BellSouth had provided, because it more accurately reflected employee reductions. Consumer Advocate presented testimony showing PSC should reduce the salary and wage expense by about $2.9 million more than the staffs recommended reduction of $5.2 million.
PSC adopted the staff recommendation, finding it fairly reflected BellSouth's salary and wage expenses while accounting for employee reductions. In its order denying Consumer Advocate's petition for reconsideration, PSC rejected Consumer Advocate's argument by saying it preferred to rely upon actual, audited figuresnot the unaudited data that included the month of June 1995. The circuit court affirmed the PSC's decision.
Consumer Advocate now contends that PSC's decision was not adequately documented in findings of fact or supported by substantial evidence. Consumer Advocate also argues that PSC had to consider the June 1995 data under Southern Bell v. Pub. Serv. Comm'n of South Carolina, 270 S.C. 590, 602, 244 S.E.2d 278, 284 (1978) (PSC should consider known and measurable changes in expenses, revenues and investments occurring after the test year so that resulting rates will reflect the actual rate base, net operating income, and cost of capital).
We conclude PSC adequately explained its findings of fact and reasoning when the original order and order upon reconsideration are read together. The original order, standing alone, would be insufficient under the principles outlined in Issue 1 because PSC merely recited the conflicting testimony and then stated its conclusion. The order upon reconsideration, however, reveals PSC chose not to consider the June 1995 data because it preferred to rely upon audited data. The order cites the PSC accountant's testimony, which constitutes substantial evidence supporting the agency's decision.
Southern Bell, supra, does not require PSC to consider unaudited or speculative data. It merely requires PSC to consider known and measurable changes that occur after the test year in order to accurately calculate figures that affect the company's overall rate of return and customer rates. PSC complied with Southern Bell by considering the audited data from March to May 1995. Accordingly, we affirm the judgment of the circuit court on this issue.

*29 5. AREA PLUS LOSSES

BellSouth argues the circuit court erred in reversing PSC's decision to include Area Plus losses in test-year calculations because that decision was supported by substantial evidence. We disagree.
In February 1993, BellSouth asked PSC to approve its rate plan for a new service called Area Plus.[9] PSC approved the plan. Several long-distance carriers appealed the decision in circuit court. In April 1994, PSC, BellSouth, the long-distance carriers, and Consumer Advocate entered into an agreement resolving the dispute. The parties made several stipulations, including the following: "BellSouth will not come before [PSC] requesting rate relief for any possible losses resulting from the introduction of Area Plus service, the execution of Area Calling Plan Principles Agreement, or this Stipulation." The parties further stipulated that PSC must review the agreement three years after its approval to determine whether any modifications are appropriate.
In the present case, PSC's staff and BellSouth recommended that Area Plus revenue from the first half of 1995 be included in test-year calculations. Consequently, PSC allowed BellSouth to recognize nearly $4.5 million in losses attributable to Area Plus service. Consumer Advocate protested that BellSouth was barred from recognizing those losses under the April 1994 agreement. Recognizing the losses would increase BellSouth's need for revenue from other ratepayers, which was what the stipulation was intended to prevent, Consumer Advocate argued.
PSC rejected those contentions, saying BellSouth had not requested rate relief because PSCnot BellSouthhad initiated the review of the company's earnings. Therefore, neither PSC nor BellSouth had violated the stipulation. The circuit court reversed PSC's decision. The court concluded PSC had abused its discretion because the parties reasonably expected *30 to rely on the April 1994 agreement, and PSC had offered no reason for nullifying the stipulation.
BellSouth now argues the circuit court erred because substantial evidence supported PSC's decision to include known and measurable Area Plus losses in test-year calculations. Including them did not violate the stipulation because BellSouth had not asked for rate relief, but merely submitted the information during an earnings review initiated by PSC. BellSouth also argues the parties intended for stipulations in the April 1994 agreement to be considered only if BellSouth asked to withdraw its Area Plus service or if PSC considered another specific type of long-distance service in South Carolina.
"A stipulation is an agreement, admission or concession made in judicial proceedings by the parties thereto or their attorneys. Stipulations, of course, are binding upon those who make them." Kirkland v. Allcraft Steel Co., 329 S.C. 389, 392, 496 S.E.2d 624, 626 (1998) (citations omitted). A stipulation is an agreement, an understanding. The court must construe it like a contract, i.e., interpret it in a manner consistent with the parties' intentions. Webster v. Holly Hill Lumber Co., 268 S.C. 416, 421, 234 S.E.2d 232, 234 (1977).
Because the court construes it like a contract, a stipulation that is unambiguous and explicit must be construed according to the terms the parties have used, as those terms are understood in their plain, ordinary, and popular sense. See C.A.N. Enterprises, Inc. v. South Carolina Health and Human Services Fin. Comm'n, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988) (court must construe unambiguous contracts according to plain meaning of terms used by parties); Chapman v. Metropolitan Life Ins. Co., 172 S.C. 250, 256, 173 S.E. 801, 804 (1934) (it plainly is "the duty of the court to construe a written contract if there be no ambiguous language which is susceptible of more than one meaning"); accord 83 C.J.S. Stipulations § 11 (1953); 73 Am.Jur.2d Stipulations § 7 (1974).
A party who has entered into a stipulation may seek the written consent of other parties to abrogate the stipulation. A party also may ask the court to abrogate a stipulation for good cause or because the interests of justice *31 require it. Whether to abrogate the stipulation is addressed to the sound discretion of the trial judge, and an appellate court will not interfere with that decision except when there is a manifest abuse of discretion. Strange v. South Carolina Dep't of Highways and Pub. Transp., 314 S.C. 427, 430, 445 S.E.2d 439, 441 (1994); Edens v. Cole, 261 S.C. 556, 561, 201 S.E.2d 382, 384 (1973); Brown v. Pechman, 55 S.C. 555, 563, 33 S.E. 732, 737 (1899); accord 83 C.J.S. Stipulations §§ 30-37; 73 Am.Jur.2d Stipulations §§ 12-14. When a party has not asked the court to relieve it from the terms of a stipulation, that party remains bound by the stipulation. American Surety Co. v. Hamrick Mills, 194 S.C. 221, 232, 9 S.E.2d 433, 438 (1940).
We conclude the circuit court properly enforced the plain meaning of the stipulation at issue in this case. Regardless of which entity initiated the earnings review, BellSouth asked PSC to recognize losses attributable to Area Plus. It is true that, in the end, PSC reduced BellSouth's rates by $42.3 million annually. But BellSouth plainly requested rate relief because it wanted to use Area Plus losses to avoid a further reduction in its rates, and that was precisely what BellSouth promised not to do in the April 1994 agreement. BellSouth never asked the other parties, PSC, or the court to relieve it from the stipulation. The record contains no evidence supporting PSC's decision to ignore the stipulation. In fact, a PSC engineer conceded under questioning by Consumer Advocate that BellSouth would receive rate relief if PSC allowed the company to recognize the losses. See Porter v. South Carolina Pub. Serv. Comm'n, 332 S.C. 93, 504 S.E.2d 320 (1998) (reversing circuit court order that upheld PSC's approval of certain expenses, where utility had not complied with stipulation that plainly required it to perform a cost/benefit analysis when seeking recovery of those costs).
This result does not mean, of course, that BellSouth may never ask PSC to recognize Area Plus losses. The April 1994 agreement stated PSC would review the agreement after three years, and BellSouth may ask PSC to reconsider the stipulation sooner. See Strange v. South Carolina Dep't of Highways and Pub. Transp., supra; Edens v. Cole, supra; Brown v. Pechman, supra. Accordingly, we affirm the judgment of the circuit court on this issue.

*32 CONCLUSION

We reverse the judgment of the circuit court on Issue 1 (rate of return on common equity), Issue 2 (BAPCO revenue), and Issue 3 (allowance for cash working capital). We remand this case to PSC for it to reconsider those issues solely on the basis of the record on appeal in this case. See Parker v. South Carolina Pub. Serv. Comm'n, 288 S.C. 304, 342 S.E.2d 403 (1986) (administrative agency may not consider additional evidence upon remand unless Court allows it because that affords a party two bites at the apple). We affirm the judgment of the circuit court on Issue 4 (annualization of wage and salary expenses) and Issue 5 (Area Plus losses).
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
TOAL, Acting C.J., MOORE and BURNETT, JJ., concur.
FINNEY, C.J., not participating.
NOTES
[1] The rate of return on common equity is a key figure used in calculating the overall rate of return PSC allows a utility to earn on its regulated operations in South Carolina. PSC set the overall rate of return for BellSouth at 10.86 percent in this case.

PSC's staff recommended reductions that would have decreased BellSouth's annual revenues by $58 million. Consumer Advocate recommended annual reductions of $89 million, while BellSouth hoped to limit annual reductions to $17 million.
[2] One PSC commissioner dissented from both orders, saying the rate of return on common equity should not exceed 12 percent. He stated he was "deeply concerned" by the agency's trend of "almost ignoring the Commission staff and Consumer Advocate witnesses in its considerations of recent cases."
[3] We occasionally have upheld PSC orders which were conclusory in nature. We did so in years past because no statute explicitly required an administrative agency to make specific findings of fact or state its reasoning as a predicate for judicial reviewalthough we have long believed that is the better practice. See Greyhound Lines, Inc. v. South Carolina Pub. Serv. Comm'n, 274 S.C. 168, 262 S.E.2d 22 (1980); Atlantic Coast Line R.R. Co. v. South Carolina Pub. Serv. Comm'n, 245 S.C. 229, 139 S.E.2d 911 (1965). We recently stated that the "substantial evidence test does not require that the Commission cite to facts, but that the evidence is contained in the record as a whole." Hamm v. South Carolina Pub. Serv. Comm'n, 315 S.C. 119, 123, 432 S.E.2d 454, 457 (1993); Hamm v. American Tel. & Tel. Co., 302 S.C. 210, 218, 394 S.E.2d 842, 846 (1990).

As discussed above, statutes and our precedent require an administrative agency to make specific findings of fact and explain its rationale in sufficient detail to afford judicial review. We overrule Greyhound Lines, Inc. v. South Carolina Pub. Serv. Comm'n, supra; Atlantic Coast Line R.R. Co. v. South Carolina Pub. Serv. Comm'n, supra; Hamm v. South Carolina Pub. Serv. Comm'n, 315 S.C. 119, 432 S.E.2d 454, and Hamm v. American Tel. & Tel. Co., 302 S.C. 210, 394 S.E.2d 842, to the extent that they conflict with the approach outlined above. We also overrule them to the extent that they suggest the Court will, sua sponte, search the record for substantial evidence supporting a decision when an administrative agency's order inadequately sets forth the agency's findings of fact and reasoning.
[4] "The `rate base' is the amount of investment on which a regulated public utility is entitled an opportunity to earn a fair and reasonable return. A public utility's `rate base' represents the total investments in, or fair value of, the used and useful property which it necessarily devotes to rendering the regulated services." Southern Bell v. Pub. Serv. Comm'n of South Carolina, 270 S.C. 590, 600, 244 S.E.2d 278, 283 (1978).
[5] "A `lead-lag' study empirically identifies the difference in timing between outward cash flow for labor, materials and supplies, inventory, and other expenses, and inward cash flow from charges to customers." Colorado Mun. League v. Pub. Util. Comm'n, 687 P.2d 416, 420 (Colo. 1984).
[6] Assuming a rate of return on common equity of 12.75 percent, BellSouth would have to reduce its rates by an additional $1.1 million annually if PSC set the cash working capital requirement at zero. Assuming a rate of return on common equity of 12 percent, BellSouth would have to reduce its rates by $5.7 million annually, according to Consumer Advocate.
[7] E.g., Cincinnati Gas & Elec. Co. v. Pub. Util. Comm'n, 67 Ohio St.3d 517, 620 N.E.2d 821 (Ohio 1993) (affirming commission's decision to subtract negative working capital from total working capital allowance approved for utility); Colorado Mun. League v. Pub. Util. Comm'n, 687 P.2d 416, 419-21 (Colo.1984) (affirming commission's decision to set the cash working capital allowance at zero instead of attributing negative working capital to utility); Barasch v. Pub. Util. Comm'n, 111 Pa.Cmwlth. 339, 533 A.2d 1108, 1112-14 (Pa.Commw.Ct.1987) (same).
[8] E.g., Chesapeake Util. Corp. v. Delaware Pub. Service Comm'n, 705 A.2d 1059, 1069 (Del.Super.Ct.1997) (interpreting statute to allow commission to include allowance for investor-supplied cash working capital in rate base); General Tel. Co. v. Arkansas Pub. Serv. Comm'n, 23 Ark.App. 73, 744 S.W.2d 392, 395-98 (Ark.Ct.App.) (upholding commission's decision to use modified balance sheet approach instead of lead-lag study to determine allowance for cash working capital), aff'd, 295 Ark. 595, 751 S.W.2d 1 (1988); People's Counsel v. Pub. Service Comm'n, 399 A.2d 43, 46 (D.C.Ct.App.1979) (approving an allowance for cash working capital in the rate base where utility's customers paid after service was rendered, and noting such an allowance is not allowed to extent that customers provide cash working capital because that forces customers to pay a return on funds they advanced); Chesapeake and Potomac Tel. Co. v. Pub. Service Comm'n, 201 Md. 170, 93 A.2d 249 (Md.1952) (affirming commission's decision not to include cash working capital in rate base where utility's customers paid in advance).
[9] Area Plus is an optional service that expands a subscriber's local calling area. BellSouth charges substantially lower rates for calls within that area than it usually charges. BellSouth's revenue under the former billing system decreases when subscribers switch to Area Plus and the volume of calls remains the same.