762 S.E.2d 734

The **MILTON P. DEMETRE FAMILY LIMITED PARTNERSHIP**, Appellant,

v.

Harry **BECKMANN, III, Patricia P. Beckmann, Annie Ruth Hilton Crowley, Raymond Moody Crowley, Donald William Crowley, Harris L. Crowley, Jr. and Annie Ruth Crowley Atkinson**, Respondents.

Appellate Case No. 2012–212136.

No. 5263.

Court of Appeals of South Carolina.

Heard June 2, 2014.

Decided Aug. 20, 2014.

74

John Hughes Cooper and John Townsend Cooper, both of John Hughes Cooper, P.C., of Mount Pleasant, and Cain Denny, of Cain Denny, P.A., of Charleston, for Appellant.

Jefferson D. Griffith, III, and Richard L. Whitt, both of Austin & Rogers, P.A., of Columbia, for Respondents.

SHORT, J.

In this action to quiet title, the Milton P. Demetre Family Limited Partnership (Demetre) appeals an order of the Master–in–Equity (the master), arguing the master erred in finding Demetre did not quiet title to certain property on Folly Island. We affirm in part and vacate in part.

## I. BACKGROUND FACTS[1]

In 1920, Jefferson Construction Company platted and subdivided most of the Island of Folly Beach, South Carolina. The 1920 plat was recorded in the Charleston County Register of Mesne Conveyance Office (RMC). In 1965, the 1920 plat was redrawn due to deterioration, and in 1968, it was traced. The redraw added parcels to the 1920 plat; however, the tracing appears to be identical to the 1920 plat. The 1965 and 1968 plats were also recorded and share the same book and page number as the 1920 plat. The 1965 plat added parcels to the 1920 plat; however, the 1968 plat appears to be identical to the 1920 plat and does not include the subject parcels, lots 209 and 210, on Indian Avenue, East.

Between approximately 1921 and 1926, the Folly Beach Improvement Company (FBIC) acquired the entire island of Folly Beach and mortgaged its complete interest to Citizens and Southern National Bank of Savannah (C & S Bank). In 1937, the FBIC sold the streets, avenues, and/or lanes in and upon Folly Island to the Board of Township Commission of Folly Island for the use of the public.

---

1. The Background Facts are substantially taken from the facts in *The Milton P. Demetre Family Limited Partnership v. Beckmann*, Op. No. 2009–UP–029, 2009 WL 9524570 (S.C.Ct.App. filed Jan. 14, 2009, withdrawn, substituted, and refiled, Apr. 21, 2009). We refer to the April 2009 opinion as *Demetre I*.

In 1942, C & S Bank foreclosed on the mortgage, and Edward Seabrook, Sr., purchased the land at a public auction. The deed conveyed the island to Seabrook "[s]aving and excepting therefrom such lots and portions of land as have from time to time been conveyed to sundry parties by [FBIC] by deeds recorded in the RMC Office for Charleston County." The 1942 deed also states the property conveyed is "bounded ... on the West by the Channel of Folly River and Folly Creek ... as delineated by the red line" of an 1895 plat (the Tartus survey). The 1942 Deed also refers to the 1920 plat. Seabrook, Sr., and his wife, Fannie, conveyed Seabrook's property to their son, Edward Seabrook, Jr., through the wills of Seabrook, Sr., who died in 1956, and of Fannie, who died in 1960.

From Seabrook, Jr., in 2002, Demetre purchased lots 206 to 208 on Indian Avenue, East for $45,000. Demetre purchased lots 202 to 205 in 2002 from another seller for $475,000. Also in 2002, Demetre purchased "[a]ny and all interest in marsh-land or highland north of lot 201 Indian Avenue East" for $5 from another seller.

On May 30, 2002, Demetre purchased from Seabrook, Jr., the "portion of ... roadway [on Indian Avenue] that is unde-veloped and unpaved" bordering lots 201 to 205 for $10,000 by quitclaim deed. After contact with the City of Folly Beach, Demetre believed Seabrook owned the land.[2] However, nei-ther the mayor nor the city administrator remembered notify-ing Demetre or its realtor that the City of Folly Beach did not own the land.

On December 6, 2002, Demetre brought an action against the City of Folly Beach to quiet title in the road located at the two-hundred block of East Indian Avenue on Folly Beach, South Carolina ("Road"), which borders other property Deme-tre owns (The "Road" case). Folly Beach asserted ownership of the Road. Emily Brown, intervenor, owns lot 204 on East Huron Avenue and has used the Road to access her property since January 30, 1986.

---

2. Demetre's realtor, Keith McCann, sent Demetre a letter stating the Mayor and City Administrator had determined the City of Folly Beach did not own the road and that Seabrook did.

On January 23, 2004, Demetre purchased two riverfront lots, 209 and 210, on East Indian Avenue from Seabrook, Jr., for $23,700 by quitclaim deed. The deed references the 1920 plat.[3] Lots 209 and 210 are shown on the 1965 plat, but they do not appear on the 1920 plat or the Charleston County tax map.[4] Both the 1920 plat and the 1968 plat portray a portion of East Indian Avenue extending from lot 201 to the northwest corner of lot 205. Beyond that, the plats portray the land as marshland.

In a separate action, on October 7, 2005, Demetre brought an action against Annie Crowley, Raymond Crowley, Donald Crowley, Harris Crowley, Jr., and Annie Atkinson (the "Crowleys"), and Harry and Patricia Beckmann (the "Beckmanns") for declaratory judgment and to quiet title to lots 209 and 210 where the Crowleys and Beckmanns have docks. The Crowleys and Beckmanns were permitted to intervene in the Road case because their lots abut East Indian Avenue. The Crowleys purchased lot 210, East Huron Avenue, on September 1, 1964, and the Beckmanns purchased lot 209, East Huron Avenue, on April 27, 1972. Both of the deeds referenced the 1920 plat, which shows no lots between their lots and the marsh abutting the river. The Crowleys and Beckmanns believed they owned all of the property from their homes to the marsh. Harry Beckmann testified he believed the State owned everything from his property line to the Folly River. In 1988, both the Crowleys and the Beckmanns applied for permits from the South Carolina Coastal Council (Council) to construct docks from their lots to the Folly River across East Indian Avenue lots 209 and 210. The Council granted the permits, and the docks were constructed.[5]

---

3. The quitclaim deed also states, "portions of the roadways named Indian Avenue, East and Third Street, East conveyed by this deed are unimproved, undeveloped, unpaved, undedicated, and abandoned; and, now become[ ] part of a private fifty (50) foot wide roadway owned by [Demetre] ... as shown on the [1920] Plat that is adjacent to and borders on Lot Numbers [201–210] Indian Avenue, East."

4. Demetre alleged he paid taxes on the property, including the roads and marshland.

5. The docks were destroyed by Hurricane Hugo in 1989, and they were rebuilt in approximately 1990.

After reference to the master and consolidation, the cases were tried on December 12, 2006. On March 2, 2007, the master issued the "Road" Order, finding the Road was dedicated to the public and the City of Folly Beach owned the Road. On March 26, 2007, the master issued the "Dock" Order, ruling in favor of the dock owners on all grounds. The master denied Demetre's post-trial motions to reconsider. Demetre timely appealed both orders to this court, and we consolidated the appeals. This court heard the matter, *Demetre I*, on November 6, 2008, and issued its refiled opinion on April 21, 2009.[6]

In *Demetre I*, this court separated the appeal into "The Road Case" and "The Dock Case." As to the Road Case, the court explained the 1937 deed dedicated all streets, avenues, and/or lanes to Folly Beach. The court noted the 1920 plat, which was referenced in Demetre's deeds, showed East Indian Avenue extending from lot 201 to the northwest corner of lot 205. The court affirmed the master's finding that the Road was dedicated to Folly Beach, and it accepted the dedication. The court also affirmed the master's finding that Demetre did not satisfy the elements of equitable estoppel. In its conclusion, the court stated: "[W]e affirm the master's . . . order finding Folly Beach owns East Indian Avenue . . . ."

As to the Dock Case, this court found the following:

Demetre sought a declaration that [it] owns all the property between the Crowleys' and the Beckmanns' lots and the mean high water mark, and [it] sought to quiet any defects in [its] title to the land. The master did not rule on either request and only held the Crowleys and the Beckmanns believed the State owned the land when they applied for their dock permits, which does not resolve the question of actual ownership. Demetre does not dispute the presumption that the State holds in trust for public purposes the property below the mean high water mark. Therefore, because the master failed to rule on Demetre's requests for a declaration of ownership and to quiet title to the portions of the lots above the high water mark, we remand this case to the master for a determination on this issue.

---

6. The original opinion in *Demetre I* was filed January 14, 2009. The original opinion was withdrawn, substituted, and refiled April 21, 2009.

The supreme court denied Demetre's petition for certiorari on April 8, 2010.

## II. FACTS PERTAINING TO THIS APPEAL

On remand, after Demetre's written request, the master heard arguments without receiving additional evidence. Demetre initially argued the issue on remand was settled because the parties stipulated at trial to record title. The Crowleys and Beckmanns (Respondents) argued the stipulation was merely "that the records were what the records were, and we simply were stipulating that if you went down to the [RMC] ... that this is what you would find. There were deeds into [Demetre].... But what those deeds mean, that's a whole 'nother story. We certainly are not stipulating to any good title...."

Demetre also argued Respondents' affirmative defenses were no longer viable because they had "been either abandoned or lost at the trial level and/or overruled by the Court of Appeals." Demetre argued the defenses were either not ruled upon; not appealed; waived; and/or law of the case. Respondents disputed their affirmative defenses were not viable. Respondents claimed entitlement to the defenses of the forty-year statutory presumption of a grant; the twenty-year common law presumption of a grant; adverse possession; and laches.

On the merits, the parties argued the issues as "Chain of Title" and "Accretion." Demetre argued the deeds described the footage of the Respondents' lots as 150 feet from East Huron Avenue and did not "say anything about going an inch further than 150 feet" and did not mention East Indian Avenue. Demetre also argued Respondents' permit applications, signed under oath, claimed 150 feet from Huron Avenue. Demetre relied on his chain of title, including the quitclaim deed, for property north of lots 209 and 210 to the Folly River and the "unpaved roadway bordering 201 through 210 and Third Street roadway adjacent to Lot 210 East Indian."

Respondents argued any property not owned by the State from their lots to the Folly River belongs to them because their deeds reference the 1920 plat showing nothing behind their lots except marshland, and Demetre's alleged lots situat-

ed between Respondents' lots and the marshland were not effectively transferred by the quitclaim deed.

Demetre next argued the only evidence of true delineation was in a 2005 plat (referred to by the parties as the Kennerty Topograpic Survey) and the 1965 plat. Demetre argued the 1920 plat did not indicate the mean high water mark, and its designation of "marshland" included low and high land. Demetre argued because the 1965 plat indicates the lots, and Respondents stipulated to record title, then it purchased the lots by its quitclaim deed. Further, Demetre argued it was entitled to quiet title because the 1965 plat is recorded at the same location, page 158 of Plat Book C, as the 1920 plat.

As to the accretion argument, Respondents maintained the State owned the marsh, and any accretion belonged to them as owners of the properties adjacent to the marsh. Demetre maintained there was no evidence of accretion. Demetre also argued Respondents' dock permit applications indicated Respondents were not claiming accretion. Demetre argued the attachments to the permit applications showed high marshland beyond the 150 feet that Respondents did not claim. The permit applications were for 700 foot docks "to Folly River."

The master questioned if the State needed to be a party to the action. Demetre and Respondents argued the issue was related to land above the high water mark; therefore, the State was not required to be a party.

By order filed January 13, 2012, the master first determined "any challenge to ownership of this marshland must be pursued in an action against the State...." The master, after noting the parties did not want to add the State as a party, concluded, "this court disagrees [because] the 'high marsh' is contained within the area previously denoted as Marshland." The master determined the issue was the "highland contained within what was formerly marshland" and looked to the chain of title, finding although the 2005 Kennerty plat delineates both high and low marsh, the 1920 plat shows the property in question to be "Marshlands." The master further found only the 1965 plat shows lots located at the area in dispute. Thus, the master found the "1965 plat is incorrect and, therefore, cannot serve as a basis for the creation of new lots on Folly Beach." The master found the lots "did not exist" at the time

of the conveyance to Seabrook, Sr. The master also found, "The subsequent plat from 1968 also shows the area in question to be marshland. I find [the] 1968 plat evidently intended to correct the 1965 plat error."

The master found the 1942 [7] deed to Seabrook, Sr., did not include the lots, stating "[t]his fact was apparently known to [Seabrook, Jr.,] who determined he would only convey the lots in question to [Demetre] by Quitclaim deed in 2004," which the master recognized "is not a representation of good and valid title. . . ." The master concluded Respondents' docks had been in place for many years prior to Demetre's purchase of the property, and Demetre's purchase was done "with full knowledge and understanding that [Respondents] had a vested property interest, granted under license from the [S]tate, to the docks which run from in front of their property, commencing in . . . Indian Avenue, and running to the Folly River."

The master also found the following,

[W]hile the oldest diagram submitted to the court in this litigation was an 1895 engineer's "Map of Folly Island," this court concludes, based upon *Query* [*v. Burgess*, 371 S.C. 407, 639 S.E.2d 455 (Ct.App.2006) ], that the 1786 plat is the genesis for title to all marshland located on Folly Island— this issue has previously been decided by *Query* and is adverse to the position taken by either party in this litigation. At a minimum, the parties should present the full history of title to the court for a complete hearing.

The purpose of the remand order was to determine [Demetre's] interest in the property and quiet title in [Demetre] if applicable. I find under the facts presented here, as between these parties, that [Demetre] has not prevailed under its burden of proof. I further find that there is no basis to quiet title, in Demetre, based on Demetre's claim of title to the land.

The master summarized the findings of fact: (1) Demetre's deeds refer to the 1920 plat; (2) the 1920 plat does not show Demetre's lots; therefore, they do not exist; (3) Demetre can only own what was deeded in the 1920 plat, which is described

---

7. The master's reference to the "Master's Deed of January 5, 1943" to Seabrook, Sr., refers to the 1942 deed, which was recorded January 5, 1943.

as marshland; (4) Respondents' deeds show East Indian Avenue as their riverward boundary; (5) any highland riverward of Respondents' lots was contained within the designation of "Marshland" in the 1920 plat; (6) the State is the owner of the land seaward of Respondents' lots; and (7) Demetre is not entitled to quiet title. The master ruled against Respondents on their affirmative defenses. The master concluded: "[Demetre] does not own any portion of the highland between [Respondents'] lots and the mean high water mark on lots 209 and 210, East Indian Avenue; [and Demetre] is not entitled to have title quieted in its name." Demetre moved for reconsideration, which the master denied, finding the 1786 plat dispositive. This appeal followed.

## III. LAW/ANALYSIS[8]

### 1. The Stipulation Issue[9]

■ Demetre argues the master erred by disregarding Respondents' stipulation to record title. We disagree.

During the trial,[10] the parties retired to the master's chambers to discuss the parties' stipulations. After returning to the courtroom, the parties entered the following stipulation on the record:

It is stipulated by and between attorneys for the parties that record title for [Demetre] has been stipulated to.

. . . .

The chain of title for Lot 210 Huron Avenue East into the Crowleys has been stipulated to.

And the chain of title to the Beckmanns to Lot 209 Huron Avenue East has been stipulated to.

All of those have been agreed by counsel that they are stipulated to, as far as record title.

---

**8.** We consolidate Demetre's sixteen arguments into four issues: (1) the stipulation; (2) Respondents' affirmative defenses; (3) the master's findings as to the State or Respondents' ownership in the property; and (4) the master's finding Demetre failed in its burden of proof to quiet title.

**9.** Demetre's Issue 4.

**10.** References to the trial refer to the trial prior to the first appeal in *Demetre I*; references to the hearing refer to the post-remand hearing.

During the hearing, Demetre argued entitlement to quiet title because the parties stipulated at trial to record title. Respondents argued the stipulation was merely that "the records were what the records were, and we simply were stipulating that if you went down to the [RMC] . . . that this is what you would find. There were deeds into [Demetre]. . . . But what those deeds mean, that's a whole 'nother story. We certainly are not stipulating to any good title. . . ." The master found the stipulations were "to how each got their title."

 "A stipulation is an agreement, admission or concession made in judicial proceedings by the parties thereto or their attorneys." *Kirkland v. Allcraft Steel Co.*, 329 S.C. 389, 392, 496 S.E.2d 624, 626 (1998). "Stipulations, of course, are binding upon those who make them." *Id.* "The court must construe [a stipulation] like a contract, i.e., interpret it in a manner consistent with the parties' intentions." *Porter v. S.C. Pub. Serv. Comm'n*, 333 S.C. 12, 30, 507 S.E.2d 328, 337 (1998). The interpretation of a stipulation is addressed to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *See id.* at 31, 507 S.E.2d at 337 ("Whether to abrogate the stipulation is addressed to the sound discretion of the trial judge, and an appellate court will not interfere with that decision except when there is a manifest abuse of discretion.").

We conclude the master properly interpreted the meaning of the stipulation at issue in this case. The question litigated was not whether Demetre held record title to the property; rather, the question litigated was whether the record title validly conveyed the subject property as to quiet title in Demetre. Accordingly, we affirm the master's interpretation of the stipulations.[11]

## 2. Respondents' Affirmative Defenses[12]

Demetre argues the master erred in ruling on the affirmative defenses, claiming the court's action in *Demetre I* ren-

---

11. We find no merit to Demetre's summary argument that it is entitled to quiet title because it paid property taxes on the property at issue. The citations to the record do not support Demetre's argument.

12. Demetre's issues 5, 6, and 15.

dered the affirmative defenses "law of the case." It also argues the master should have cited to authority in ruling against Respondents on their affirmative defenses. We find no reversible error.

During the hearing, Demetre argued Respondents' affirmative defenses were no longer viable because they had "been either abandoned or lost at the trial level and/or overruled by the Court of Appeals." Demetre argued the defenses were either not ruled upon, not appealed, waived, and/or law of the case. Respondents asserted their affirmative defenses were viable. The master ruled against Respondents on its affirmative defenses. We find no prejudice to Demetre arising from the master's rulings against Respondents on their affirmative defenses; thus, any error is not reversible. *See Visual Graphics Leasing Corp. v. Lucia*, 311 S.C. 484, 489, 429 S.E.2d 839, 841 (Ct.App.1993) ("An error is not reversible unless it is material and prejudicial to the substantial rights of the appellant.").

■■ Finally, Demetre argues the master erred in failing to quiet title in Demetre because the master ruled against Respondents' affirmative defenses. Demetre claims, without citation to authority, "Where there are no affirmative defenses, record title is good." Respondents argue a stipulation to record title is not a stipulation to good title. Respondents maintain Demetre had the burden to prove good title. "In an action to quiet title, the plaintiff must recover on the strength of his own title, not on the alleged weakness of the defendant's title." *Hoogenboom v. City of Beaufort*, 315 S.C. 306, 313, 433 S.E.2d 875, 880 (Ct.App.1992) (citations omitted). We find no merit to Demetre's claim of automatic vesting of title in its action to quiet title based on Respondents' failure to prove its affirmative defenses.

### 3. The Master's Findings Granting Property Interests to Others[13]

■ Demetre argues the master erred in the following: (1) finding the State was a necessary party; (2) holding the State

---

13. Demetre's issues 2, 3, 7, 8, 9, 13, and 16.

owns the subject property above the mean high water mark; (3) concluding Respondents have vested property interests in their docks; (4) finding the State owns any accreted highland; (5) finding the State owns the land seaward of Respondents' lots because the subject property was within the designation of "Marshland" on the 1920 plat of Folly Island; (6) finding the 1965 plat was "incorrect" and the 1968 plat corrected the error; and (7) finding the State owns the undeveloped portion of the roadway riverward of Respondents' lots when *Demetre I* affirmed only the Town's ownership to the end of the northeast corner of Lot 205. As to all findings regarding the necessity of the State as a party, the State or Respondents' interests in the subject property, and the interpretation of all plats other than as applied to the issue of Demetre's ability to quiet title in Lots 209 and 210, we agree and vacate those portions of the order on appeal.

 "[A] trial court has no authority to exceed the mandate of the appellate court on remand." *S.C. Dep't of Soc. Servs. v. Basnight*, 346 S.C. 241, 250, 551 S.E.2d 274, 279 (Ct.App.2001). "The mandate of the appellate court is jurisdictional. The trial court has a duty to follow the appellate court's directions." *Prince v. Beaufort Mem'l Hosp.*, 392 S.C. 599, 605, 709 S.E.2d 122, 125 (Ct.App.2011) (citation omitted); *see Basnight*, 346 S.C. at 250–51, 551 S.E.2d at 279 (noting "[o]nce a mandate is issued from an appellate court to a trial court, the trial court 'is vested with jurisdiction only to the extent conferred by the appellate court's opinion and mandate'" (quoting 5 Am.Jur.2d *Appellate Review* § 784, at 453 (1995))).

The mandate in *Demetre I* directed the master to "rule on Demetre's requests for a declaration of ownership and to quiet title to the portions of the lots above the high water mark." To the extent the master exceeded the mandate by finding the State was a necessary party, by finding any property interest in the State or Respondents, by finding the 1965 plat was "incorrect," and by determining the location of the mean high water mark, we vacate that portion of the order.

### 4. Demetre's Failure to Quiet Title in Lots 209 and 210[14]

▆▆▆ Demetre argues the master erred in the following: (1) relying on the 1920 plat to determine Demetre's claim; (2) finding its predecessor in interest, Folly Beach Corporation, took title based on the 1920 plat, rather than the 1895 Tartus Map referenced in the deed to Folly Beach Corporation;[15] (3) finding the 1786,[16] 1895, and 1920 plats are more precise than the 2005 Kennerty Topographic Survey, which is the only plat that shows the location of the mean high water mark; (4) finding Lots 209 and 210 "do not exist" because they are not shown on the 1920 plat;[17] and (5) finding Seabrook, Jr., believed he did not have title to the property.

Demetre entered an exhibit indicating the following chain of title:

—Deed from Folly Island Company to Folly Beach Corporation recorded November 18, 1919, referring to the 1895 Tartus Map;

—Deed and quitclaim deed from Alexander family members to Folly Beach Corporation recorded January 17, 1921, referring to an 1863 Parker survey;[18]

---

14. Demetre's issues 1, 10, 11, 12, and 14.

15. This issue also asserts error in the master's finding that the State owns the property, which we vacate in the previous section. To the extent the master erred in finding the deed referenced the 1920 plat rather than the 1895 plat, we find no prejudice because neither plat depicts the lots Demetre claims.

16. The 1786 plat is referred to in *Query v. Burgess*, 371 S.C. 407, 412, 639 S.E.2d 455, 457 (Ct.App.2006) ("The plat roughly delineates Folly Island. The plat contains the bare bones of a survey and is neither precise nor detailed.").

17. We find no merit to Demetre's claim that the master's finding—that lots 209 and 210 on Indian Avenue East do not exist—conflicts with the remand mandate in *Demetre I*. The mandate directed the master to rule on Demetre's requests for a declaration of ownership and to quiet title to the portions of the lots above the high water mark. We read the mandate as requiring the master to determine whether Demetre proved the right to quiet title. We do not read, as argued by Demetre, a directive to determine who owns the subject property.

18. Neither Demetre nor the master relied on the 1863 Parker survey.

—Deed except for lots already conveyed from Folly Beach Corporation to Folly Beach Improvement Company recorded January 20, 1926, referring to the 1863 Parker survey and February and May 1920 plats;

—1942 master's deed to Seabrook, Sr., except for lots already conveyed, recorded January 5, 1943;

—Seabrook, Sr., to Seabrook, Jr., by will;

—Quitclaim deed from Seabrook, Jr., to Demetre of lots 209 and 210 Indian Avenue, East, including the roadway, referring to February 1920 plat.

Thus, Demetre's chain of title references the 1863 survey, the 1895 Tartus plat, and the 1920 plat. The deed to Demetre references only the 1920 plat.

During the trial, when asked why he only paid $23,000 for the lots, Milton Demetre testified Seabrook, Jr., told him to make him an offer. Mr. Demetre continued, "He could have sold it for $5 and a deed. I don't know." When asked why he offered Seabrook, Jr., $23,000, Mr. Demetre responded, "He said make him an offer, and that's what I did."

As to Demetre's deeds, the master found the following: (1) Demetre's deeds refer to the 1920 plat; (2) the 1920 plat does not show Demetre's lots; therefore, they do not exist; (3) Demetre can only own what was deeded by reference to the 1920 plat, which is described as marshland; and (4) Demetre is not entitled to quiet title. After finding the lots did "not exist as legal lots today," the master found "[t]his ... was apparently known to [Seabrook, Jr.,] who determined he would only convey the lots in question to [Demetre] by [q]uit-claim deed." The master further found Seabrook, Jr. "was willing (for a price) to grant whatever title he may have had in this property—whether he had any interest in this property or not."

"In an action to quiet title, the plaintiff must recover on the strength of his own title, not on the alleged weakness of the defendant's title." *Hoogenboom*, 315 S.C. at 313, 433 S.E.2d at 880. "One claiming title by deed has no greater title than the original grantor in the chain of title upon which he relies." *Id.* at 313, 433 S.E.2d at 880–81 (citing *Belue v. Fetner*, 251 S.C. 600, 606–07, 164 S.E.2d 753, 756 (1968)

(stating a deed cannot convey an interest which the grantor does not have)).

"[T]he purpose and effect of a reference to a plat in a deed is ordinarily one as to the intention of the parties to be determined from the whole instrument and the circumstances surrounding its execution." *Lancaster v. Smithco, Inc.,* 246 S.C. 464, 468, 144 S.E.2d 209, 211 (1965). "Where a deed describes land as it is shown on a certain plat, such plat becomes part of the deed for the purpose of showing the boundaries, metes, courses and distances of the property conveyed." *Hobonny Club, Inc. v. McEachern,* 272 S.C. 392, 397, 252 S.E.2d 133, 136 (1979) (citations omitted). In construing a deed, the court must determine the intent of the grantor. *K & A Acquisition Grp., LLC v. Island Pointe, LLC,* 383 S.C. 563, 581, 682 S.E.2d 252, 262 (2009). To determine the grantor's intent, the deed must be construed as a whole. *Id.*

A quitclaim deed is a lawful means of conveying title. *Martin v. Ragsdale,* 71 S.C. 67, 77, 50 S.E. 671, 674 (1905) (citing former version of S.C.Code Ann. § 27-7-20 (2007) ("[T]his section shall be so construed as not to oblige any person to insert the clause of warranty or to restrain him from inserting any other clause in conveyances, as may be deemed proper and advisable by the purchaser and seller, or to invalidate the forms formerly in use within this State.")). However, "[a] quitclaim deed does not guarantee the quality of title, but only conveys that which the grantor may lawfully convey." *Mulherin–Howell v. Cobb,* 362 S.C. 588, 601, 608 S.E.2d 587, 594 (Ct.App.2005) (acknowledging "a quitclaim deed does not convey the fee, but only the right, title[,] and interest of the grantor") (citing *Martin,* 71 S.C. at 77, 50 S.E. at 674)). Although the supreme court in *Martin* was discussing a purchaser whose seller took title under a quitclaim deed, we find the following language instructive:

> The authorities are conflicting as to whether a person can interpose the defense of purchaser for valuable consideration without notice, when he derives his title from one holding under a mere quitclaim deed. In the case of *Aultman v. Utsey,* 34 S.C. 559, 571, 13 S.E. 848 [ (1891) ], the Court says: "Some of the cases go so far as to hold that

one who purchases from another, holding under a quitclaim deed, cannot, by reason of that fact, claim to be a purchaser without notice." *See* 2 Pom. Eq. Jur., sec. 753, where the cases both *pro* and *con* are cited in a note. . . . The reason given is, that such a purchaser buys no more than what his grantor can lawfully convey; to which, we think, might be added, that the fact that the grantor is unwilling to warrant the title, tends at least to show that there is some defect in the title, known to or apprehended by him, and, therefore, the purchaser is put upon inquiry. While we are not prepared at present to go to the full extent to which the doctrine has been carried by some of the cases, yet we are satisfied that the fact that the immediate grantor of the purchaser holds under a quitclaim deed, is a circumstance well calculated to excite inquiry, which, if not pursued properly, will affect the purchaser with notice of every fact which such inquiry, pursued with due diligence, would disclose. . . .

*Martin*, 71 S.C. at 76–77, 50 S.E. at 674.

We agree with the master's conclusion that Demetre failed in his burden of proving title to Lots 209 and 210. Neither the 1920 plat nor the 1895 Tartus plat depict the lots. Demetre acknowledged at the remand hearing that the lots did not exist as lots on the 1920 plat. Demetre relies on the 2005 Kennerty plat and the 1965 plat, which are not in his chain of title and were not in existence at the time the property was last deeded prior to the quitclaim deed to Demetre. Furthermore, as to the master's finding that Seabrook, Jr., believed that he did not have title, we find evidence in the record to support the master's finding. *See Estate of Tenney v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 100, 105, 712 S.E.2d 395, 397 (2011) (stating a master's factual findings in an action to quiet title will be affirmed by an appellate court if there is any evidence in the record reasonably supporting the findings). We find Demetre has failed to meet his burden of proving title to lots 209 and 210. Accordingly, we affirm the master's order to the extent it found Demetre failed to quiet title in lots 209 and 210.

## IV. CONCLUSION

We affirm the master's order regarding the stipulation, Respondents' affirmative defenses, and Demetre's failure to

quiet title in lots 209 and 210. To the extent the master exceeded the mandate by finding the State was a necessary party, by finding any property interest in the State or Respondents, by finding the 1965 plat was "incorrect," and by determining the location of the mean high water mark, we vacate the order.

FEW, C.J., and GEATHERS, J., concur.