# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In re Application of Blue Granite Water Company for Approval to Adjust Rate Schedules and Increase Rates, Appellant.

Appellate Case No. 2020-001283

---

Appeal from the Public Service Commission

---

Opinion No. 28055
Heard June 15, 2021 – Filed September 1, 2021

---

## AFFIRMED IN PART AND REVERSED IN PART

---

Frank R. Ellerbe III and Samuel J. Wellborn, both of Robinson Gray Stepp & Laffitte, LLC, of Columbia, for Appellant Blue Granite Water Company.

Andrew M. Bateman, Alexander W. Knowles, Christopher M. Huber, and Steven W. Hamm, all of Columbia, for Respondent South Carolina Office of Regulatory Staff; Carri Grube Lybarker, Roger P. Hall, and Connor J. Parker, all of Columbia, and Richard L. Whitt, of Whitt Law Firm, LLC, of Irmo, all for Respondent South Carolina Department of Consumer Affairs; Michael K. Kendree Sr., of York, for Respondent York County; S. Jahue Moore, of Moore Taylor Law Firm, P.A., of West Columbia, for Respondent Town of Irmo; John Julius Pringle Jr., of Columbia, for Respondent Building Industry Association of South Carolina; and Laura P. Valtorta, of Valtorta Law Office, of Columbia, for Respondent Forty Love Point Homeowners' Association.

**JUSTICE KITTREDGE:** This is an appeal from the South Carolina Public Service Commission (PSC). The PSC is a quasi-judicial body established by the South Carolina General Assembly. The legislature has delegated to the PSC the "power and jurisdiction to supervise and regulate the rates and service of every public utility in this State and to fix just and reasonable standards, classifications, regulations, practices, and measurements of service to be furnished, imposed, or observed, and followed by every public utility in this State." S.C. Code Ann. § 58-3-140(A) (2015). Part of this power includes the authority "to create incentives for utilities to improve their business practices." *Utils. Servs. of S.C., Inc. v. S.C. Office of Regul. Staff*, 392 S.C. 96, 105, 708 S.E.2d 755, 760 (2011) ("The PSC [has the] power[] . . . to fix just and reasonable standards, classifications, regulations, practices, and measurements of service. Pursuant to these powers, the PSC is entitled to create incentives for utilities to improve their business practices. Accordingly, the PSC may determine that some portion of an expense actually incurred by a utility should not be passed on to consumers." (citations omitted) (internal quotation marks omitted)). The PSC's order on appeal here is primarily focused on providing incentives to the utility to improve its business practices.

The appellant, Blue Granite Water Co. (Blue Granite), is a utility that provides water and sewer services. Blue Granite was formerly known as Carolina Water Service (CWS). CWS changed its name to Blue Granite as part of a rebranding campaign, for the utility had earned an unfavorable reputation throughout the state. In rejecting Blue Granite's request for an approximate 50% rate increase, and in an effort to incentivize Blue Granite to improve its business practices, the PSC set a lower return on equity (ROE) than requested and allowed only certain portions of Blue Granite's requested costs, citing to the utility's known, poor reputation and service problems. On appeal, Blue Granite contends the PSC's attempts to incentivize the utility actually unfairly punished the company in violation of law.

While Blue Granite raises nine specific concerns, we have condensed those concerns to four primary issues on appeal: whether the PSC erred in (1) setting the permissible ROE; (2) using a ten-year average—rather than a five-year average—to calculate typical storm costs; (3) disallowing all costs associated with Blue Granite moving its headquarters from West Columbia to Greenville, including any office rental expenses; and (4) staying Blue Granite's ability to implement its new, higher rates under bond during the course of the appeal. We reverse in part and affirm in part. As to the issues involving the ROE, storm costs, and bond, we find the PSC's decision was not unfairly punitive, not arbitrary or capricious, and not

clearly erroneous. However, as to the Greenville office expenses, we find the PSC's decision to *completely* deny yearly rental expenses was arbitrary and capricious. We therefore remand to the PSC for additional proceedings.

## I.

Blue Granite is a relatively small-size utility providing water and sewer services to approximately 28,000 customers in South Carolina. In October 2019, Blue Granite filed an application for ratemaking with the PSC. Prior to that application, Blue Granite received annual rate revenues of almost $24 million. It sought to increase those rates by nearly $12 million per year, an approximate 50% increase.

Unsurprisingly, Blue Granite (and former CWS) customers from all over the state protested such a large increase, and, at the affected customers' requests, the PSC scheduled six hearings to receive testimony from customers. At those hearings, customers complained extensively about Blue Granite's relatively-high rates compared to other utilities in the area and the impact Blue Granite's proposed flat fees would have on low-income customers. Likewise, many of the customers who testified reported "incidents of poor water quality, unresponsive customer service, inaccurate meter readings, billing errors, and unwarranted cut-offs, among other problems." For example, one of the customers testified Blue Granite had wrongfully plugged his sewer line, resulting in his house being flooded with sewage. Another testified to a similar event in her neighborhood, resulting in raw sewage running through the entire neighborhood, including the community park and pool. Due to the extensive service problems, a number of the customers requested the PSC deny Blue Granite's application outright, particularly because of the number of rate increases Blue Granite had been granted in the recent past, and the dollar amounts associated with those past increases.[1]

Ultimately, the PSC granted Blue Granite a rate increase of approximately $5 million, an amount comparable to the increases granted to other similarly-sized utilities in the state. Notably, in its final order, the PSC found the customer testimony "very compelling and indicative of persistent, widespread, and pervasive

---

[1] One customer testified, "Blue Granite is applying for a 50 percent average rate increase, only two years after a 30 percent rate increase, which is unreasonable for their consumers. Add to that their statement to Representative Chris Wooten that they intend to pursue additional rate cases every two years following this one."

problems consistent with those which have frustrated customers of this utility for many years." However, the PSC explained,

> Giving effect to [*Utilities Services of South Carolina,*] as we must, we are legally foreclosed from denying Blue Granite's application for a rate increase in its entirety. . . . We have further considered all the customer [] hearing testimony and used it to guide us in creating incentives for Blue Granite to improve its business practices, cut costs, improve efficiency, and enhance quality of service.

Blue Granite filed a petition for rehearing, but the PSC denied the petition in large part. Blue Granite then directly appealed to this Court pursuant to Rule 203(d)(2)(A), SCACR.

## II.

In reviewing a decision from the PSC, this Court employs a deferential standard of review. *S.C. Energy Users Comm. v. S.C. Pub. Serv. Comm'n*, 388 S.C. 486, 490, 697 S.E.2d 587, 589 (2010). As set forth in section 1-23-380 of the South Carolina Code, the Court may not substitute its own "judgment for the judgment of the [PSC] as to the weight of the evidence on questions of fact," but may reverse or modify the decision if the PSC's findings are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record" or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." S.C. Code Ann. § 1-23-380(5)(e)–(f) (Supp. 2020). "A decision by the [PSC] is arbitrary if it is without a rational basis, is based not upon any course of reasoning and exercise of judgment, is made at pleasure, without adequate determining principles, or is governed by no fixed rules or standards." *Daufuskie Island Util. Co. v. S.C. Office of Regul. Staff*, 427 S.C. 458, 464, 832 S.E.2d 572, 575 (2019) (internal alteration and quotation marks omitted) (citation omitted). Likewise, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 136, 276 S.E.2d 304, 307 (1981) (citation omitted). "Because the [PSC's] findings are presumptively correct, the party challenging the [PSC's] order bears the burden of convincingly proving the decision is clearly erroneous, or arbitrary or capricious, or an abuse of discretion, in view of the substantial evidence of the record as a whole." *S.C. Energy Users Comm.*, 388 S.C. at 491, 697 S.E.2d at 590 (citation omitted).

## III.

## Return on Equity

### a. Underlying Facts

Three witnesses testified about the proper ROE before the PSC: (1) David Parcell on behalf of the South Carolina Office of Regulatory Staff (ORS, one of the two respondents here); (2) Aaron Rothschild on behalf of the South Carolina Department of Consumer Affairs (the Department, the second respondent); and (3) Dylan D'Ascendis on behalf of Blue Granite. According to Parcell, the ROE is the "most difficult" portion of the rate of return to estimate, and experts therefore employ various analytical models to attempt to narrow down what an appropriate ROE might be. Thus, here, each witness used three models to calculate a reasonable ROE for Blue Granite. The results of their analyses under each model resulted in an ROE range, rather than a single number. Averaging the low results for each model and the high results for each model, Parcell calculated an overall ROE range of 7.7% to 8.36%; Rothschild calculated an ROE range of 7.46% to 8.75%; and D'Ascendis calculated an ROE range of 10.2% to 10.7%.[2]

In Blue Granite's previous ratemaking applications, the PSC had expressed concern that the utility's relatively-small size could make it a riskier investment and, therefore, required a higher ROE in order to attract investors. However, both Parcell and Rothschild strongly disagreed Blue Granite's small size automatically required a higher ROE.[3] Nonetheless, both witnesses based the remainder of their

---

[2] Following Parcell's and Rothschild's criticism of his calculations, D'Ascendis later revised his ROE range to 9.75% to 10.25%.

[3] For example, Parcell explained many small water utilities were subsidiaries of larger companies, and those smaller water utilities did not raise equity capital directly from their individual investors, but rather as part of a consolidated entity from the investors in the larger parent company. Thus, according to Parcell, smaller water utilities were not riskier merely because of their size, and did not require a correspondingly larger ROE to compensate for their small size because they were not a truly risky investment. Of note, Blue Granite is a wholly-owned subsidiary of Corix Regulated Utilities, Inc. (formerly known as Utilities, Inc.), one of the three largest private water and wastewater utility operators in the United States.

calculations on the high ends of the ranges for each model in recognition of the PSC's prior concerns.

More specifically, in generating his particular ROE recommendation, Parcell used the high values from two of his three models "in order to give some consideration to any perceived unique attributes of" Blue Granite, specifically, its relatively small size—although, as stated, he disagreed the size of the utility should affect its ROE. Likewise, Parcell discounted the results from his third model because they appeared "to be somewhat low at this time, relative to the" results from the other two models. Consequently, Parcell recommended an ROE range between 8.9% (the high result from one model) and 10% (the high result from the other model), ultimately selecting 9.45% as the midpoint of that range.

In contrast, Rothschild considered the results of all three of his selected models, using the high values of the ranges "primarily because this Commission expressed concern in [Blue Granite's 2018] rate case . . . regarding its size" and whether its relatively-small size made it a riskier investment, therefore requiring a higher ROE to attract investors. However, Rothschild recommended a slightly lower ROE than the average high result of his three chosen models (8.75%) because (1) Blue Granite had less financial risk than other water utilities due to having "more equity in its capital structure" following its recent reorganization; and (2) "its business risk ha[d] declined since its last rate case and therefor[e] its cost of capital ha[d] decreased as well."[4] As a result, Rothschild recommended an ROE of 8.65%.

Rothschild further explained the 8.65% figure was "on the high end of results to account for *the possibility* that [Blue Granite's] small size impact[ed] the return expectations required by investors." (Emphasis added.) Rothschild reiterated several times that he had seen no evidence—and, in fact, there seemed to be

---

Additionally, Parcell acknowledged that, on an overall market basis, it was true that smaller companies tended to be riskier investments. However, he stated that was "not the case for regulated utilities." Specifically, Parcell asserted that "*all public utilities operate in an environment with regional monopolistic power . . . . As a result, the business and financial risks are very similar among the utilities regardless of their size*." (Emphasis added.)

[4] Moreover, according to Rothschild, "the cost of equity for utility companies [was] decreasing." Parcell similarly testified the current low-equity returns were "reflective of a decline in investor expectations of equity returns and risk premiums."

evidence to the contrary—that smaller companies had a higher cost of equity. Nonetheless, Rothschild stated, "*to be conservative*, to recognize *the possibility* that that's [the case,] I went to the higher end of my range."  (Emphasis added.)

Before Rothschild was excused from the witness stand, one PSC Commissioner questioned why Rothschild had picked a specific number for his recommended ROE, rather than a range.  Rothschild said he had provided ranges to other public utilities commissions in the past, but he was then usually asked to provide a single, specific number.  Nonetheless, Rothschild explained, "to assume that [] this exercise is that precise is an excellent question, so I think you generally can't say it's 8.65 or 8.61.  So there are various ranges that I do show in my testimony that I hope would help understand a range that's reasonable."

Rothschild additionally provided data from other major financial institutions that indicated returns on stock market investments generally ranged from 5.25% to 8.75% at the time.  According to Rothschild, investments in the overall stock market were much riskier than investments in a utility of any size and, therefore, generally earned a higher ROE than an investment in a utility.  He concluded, "It is unlikely that investors would expect to earn a higher return of equity for a cost[-]of[-]service regulated utility company than the overall stock market."

In its final order, the PSC considered and rejected D'Ascendis's testimony and ROE recommendation.[5]  The PSC further found Rothschild to be the most credible witness, placing special emphasis on the fact that his analysis "was unique in that he included the use of both historical and forward-looking, market-based data." The PSC explained Rothschild's results from his three chosen analytical models "provide[d] an ROE in the range of 7.46% to 8.75%."  Noting it was "[c]onsidering the quality of service issues known to exist with Blue Granite," the PSC concluded the "recommended ROE of 7.46% proposed by witness Rothschild" was appropriate.

---

[5] There is ample basis supporting the rejection of D'Ascendis's testimony.  For example, after summarizing Parcell's and Rothschild's testimony in which they thoroughly discredited D'Ascendis, the PSC found D'Ascendis's calculations lacked "analytical transparency" and "statistical coherence."  Having reviewed the record, the evidence firmly supports the PSC's extensive criticism of D'Ascendis's testimony, and we thus do not discuss the specifics of that testimony any further. *See* S.C. Code Ann. § 1-23-380(5) ("The court may not substitute its judgment for the judgment of the agency as to the weight of the evidence on questions of fact.").

## b. Analysis

Blue Granite now argues an ROE of 7.46% is unsupported by the evidence in the record because Parcell and Rothschild both recommended a higher ROE. We disagree with the suggestion that the PSC was foreclosed as a matter of law from selecting an ROE within the range provided by the evidence. While the PSC was, of course, empowered to select a higher ROE in accordance with the witnesses' precise recommendations, the question before us is whether the ROE actually selected (7.46%) is supported by substantial evidence.

We find there is substantial evidence in the record supporting the PSC's decision. Specifically, the PSC found Rothschild's testimony to be the most credible, including when Rothschild testified there was no reason to artificially inflate the ROE simply because Blue Granite was a smaller utility—an opinion, we note, with which Parcell completely agreed. Thus, although Rothschild *and* Parcell testified they selected the high values of their ranges in deference to the PSC's prior concern that Blue Granite's size *could* affect its level of risk, the PSC apparently reevaluated and discarded that prior concern after hearing Rothschild's and Parcell's explanations for why such a concern was unwarranted. *See S. Bell Tel. & Tel. Co. v. Pub. Serv. Comm'n*, 270 S.C. 590, 610, 244 S.E.2d 278, 288 (1978) (Ness, J., concurring in part and dissenting in part) (noting the PSC is "not bound by its prior decisions, and it may re-examine and alter its previous findings as to reasonableness when conditions warrant"); 73A C.J.S. *Public Administrative Law and Procedure* § 352 (June 2021 Update) (explaining administrative agencies are not bound by stare decisis and may reevaluate their prior decisions so long as they rationally justify their change of position). Once the PSC's prior concern—that Blue Granite's small size could impact its cost of equity—was diminished, the testimony suggested the low end of the range from Rothschild's three models (7.46%) was equally justifiable to the high end of the range (8.75%).

Blue Granite contends the PSC had no authority to select an ROE other than the ones specifically recommended by either Rothschild (8.65%) or Parcell (9.45%). However, the precise number selected by the PSC need not come from a witness's specific recommendation, but may instead be determined from the totality of the evidence in the record before the agency. Here, the record supports the 7.46% ROE determination, as it is within the stated range calculated by Rothschild. Moreover, Rothschild testified selecting an ROE is not a precise exercise. Given the fact that, regardless of which model was used, Rothschild and Parcell calculated an ROE range rather than a precise number, and those numbers did not always overlap even when both experts used the same model, we see no reason to doubt Rothschild's testimony that selecting an ROE is not an exercise in precision.

*Cf. In re Permian Basin Area Rate Cases*, 390 U.S. 747, 790 & n.59 (1968) ("[N]either law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders.").

Finally, the PSC specifically stated it set the ROE at the low end of the proffered ranges in an effort to incentivize Blue Granite to improve its admittedly-poor business practices, evidenced by the extensive customer complaints at the PSC hearings. As we previously stated in *Utilities Services of South Carolina*, the PSC is empowered to do so in appropriate circumstances, and there is nothing inherently wrong or punitive in the PSC choosing to follow that path here. *See Utils. Servs. of S.C., Inc.*, 392 S.C. at 105, 708 S.E.2d at 760. Rather, a utility's business practices and reputation are two of a number of factors the PSC may consider in selecting an appropriate ROE.[6]

As a result, because there is a basis on which a reasonable person could find a 7.46% ROE appropriate, the PSC's decision is supported by substantial evidence in the record, and we therefore affirm. *See Parker v. S.C. Pub. Serv. Comm'n*, 281 S.C. 22, 24, 314 S.E.2d 148, 149 (1984) ("We recognize that the [PSC's] interpretation of the evidence on this issue is not indisputable, but we cannot substitute our judgment for that of the [PSC] upon a question as to which there is room for a difference of intelligent opinion." (internal alteration and quotation marks omitted) (citation omitted)); *see also Hamm v. S.C. Pub. Serv. Comm'n*, 294

---

[6] Additionally, there were other factors present here that supported the PSC's decision to impose a lower ROE, including: (1) the ROEs and overall rate increases allowed to other similarly-sized utilities in the same general time frame; (2) the ROEs expected by investors in the overall (i.e., riskier) stock market; (3) the apparent lack of a need to artificially inflate the ROE of relatively-smaller utilities such as Blue Granite; (4) Blue Granite's decreased financial risk following its reorganization due to now having more equity in its capital structure; (5) Blue Granite's decrease in business risk since its last rate case, resulting in a decreased cost of capital; (6) the overall decreased cost of equity for utility companies; and (7) a "decline in investor expectations of equity returns and risk premiums." *See generally Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944) ("[T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks."); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 692–93 (1923) ("A public utility . . . has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures," such as those earned in the overall stock market.).

S.C. 320, 323, 364 S.E.2d 455, 456 (1988) ("This Court is without authority to set aside an agency's judgment on a factual issue where there is evidence of record to support the agency's decision." (citation omitted)).

## IV.

### Storm Costs

*a. Underlying Facts*

Blue Granite sought allowance of $51,802 per year in costs associated with anticipated future storm damage—the amount incurred during the test year. ORS reviewed Blue Granite's storm costs for the past ten years and found the average yearly storm costs were only $28,320.51.[7] As a result, ORS proposed a downward adjustment to account for the unusually-high storm costs incurred in the test year.

In response, Blue Granite stated it was "not opposed to using a multi-year historical average of costs," but that it believed the average storm costs should be calculated from the last five years of data, rather than the ten years proposed by ORS.[8] However, ORS rejected using a five-year average, explaining:

> ORS has consistently used a ten [] year average when proposing normalization of storm costs in past rate proceedings . . . . This is a more representative method to ensure enough data is gathered and used over a reasonable period of time to form an accurate view of storm costs. Using a five [] year average as proposed by [Blue Granite] would not allow for significant outliers that occur due to fluctuations in annual costs to be determined and removed from the average. Using a ten [] year average allows for a more complete assessment of costs over time. Therefore, ORS recommends the Commission reject [Blue Granite's] proposal to use a five [] year average for the normalization of storm costs.

The PSC found use of a ten-year average more accurately reflected storm costs for each year than use of a five-year average. Additionally, the PSC found it had

---

[7] ORS excluded the highest and lowest values from the past ten years to account for the possibility that those extremes were statistical outliers.

[8] Were the PSC to adopt the five-year average, the allowed amount would have been $42,494, rather than the $28,320.51 proposed by ORS.

previously used a ten-year average in normalizing storm costs from a test year. Therefore, the PSC adopted ORS's proposed downward adjustment, finding the adjustment to be "just and reasonable."

### b. Analysis

Blue Granite contends the PSC's decision to apply a ten-year average, rather than a five-year average, was arbitrary and capricious and unsupported by substantial evidence. We disagree. As explained by the PSC and ORS, using a larger sample size more accurately establishes the true average cost of storm damages to Blue Granite's system in any given year, thus providing a more accurate forecast in setting prospective rates for anticipated storm damages in years to come.

Moreover, in adopting the ten-year average, the PSC did not foreclose Blue Granite from seeking a deferred account for unusually high storm damages in future years. For example, in 2018, South Carolina was hit in back-to-back months with Hurricanes Florence and Michael, resulting in substantial costs to Blue Granite due to storm damages above and beyond the amount granted in its prior ratemaking proceeding. However, the PSC allowed Blue Granite to create a deferred account and recover those additional, unexpected expenses from its customers. Thus, even though the PSC used the ten-year average here, Blue Granite can request deferred accounting treatment in the event of unusually high storm costs in the future. *See Porter v. S.C. Pub. Serv. Comm'n*, 328 S.C. 222, 231–32, 493 S.E.2d 92, 97–98 (1997) (explaining that in the event a utility experiences expenses that are truly "extraordinary," i.e., "unanticipated and non-recurring," the PSC should allow the utility to create a deferred account for those expenses and amortize the expenses in calculating the rate base in the utility's next ratemaking application).

Accordingly, we find the PSC's decision to use a ten-year average to normalize storm costs was neither arbitrary nor capricious, nor unsupported by substantial evidence. We therefore affirm the PSC's decision as to this issue.

### V.

### Greenville Office Expenses

### a. Underlying Facts

Until 2018, Blue Granite/CWS owned an office building located in an industrial park in West Columbia. That office building cost ratepayers $27,260 annually for things such as water, sewer, electric, gas, landscaping, and property taxes.

However, according to Blue Granite, the location had no other office buildings or amenities nearby, so it was not a "viable location" to retain highly-qualified employees. Likewise, Blue Granite conceded that "[a]ttracting talent in the [West] Columbia market [was] extremely difficult [for the utility] due to the legacy brand issues in that market," including CWS's abysmal reputation for customer service and wastewater leaks. Therefore, in 2018, when changing its name from CWS to Blue Granite, the utility decided to relocate its headquarters, selling the West Columbia building and removing the $27,260 in annual expenses from its rate base.

Blue Granite then explored three alternate locations for its headquarters: Greenville, Columbia, and West Columbia. In selecting the new location, Blue Granite analyzed the labor statistics (also known as CBRE data[9]) in all three cities. According to Blue Granite, the CBRE data was the most favorable in Greenville, and the utility therefore opted to locate its new headquarters there, renting prime office space downtown at the historic Family Court building on South Main Street.

The yearly rent for Blue Granite's new Greenville office space was $73,665—almost triple the $27,260 annual cost of office space in West Columbia. Moreover, the $73,665 annual rent in Greenville's prime real estate market stood in stark contrast to the $11,174 in yearly, combined rental expenses for Blue Granite's other five locations throughout the state.[10] Equally perplexing, the new Greenville office required extensive upgrades to make it a functional office space, including things such as new drywall, paint, telephone ports, wiring, and office furniture. While Blue Granite repeatedly claimed that its new office was "not luxurious or gold-plated," the upfit expenses totaled approximately $500,000 for an office space intended to house only ten employees.

At the PSC hearing, ORS contested the Greenville office upfit and rental expenses. As to the $500,000 in upfit expenses, ORS contended the amount was unreasonably incurred by Blue Granite. In particular, ORS pointed to a letter from the utility to its customers explaining the name change from CWS to Blue Granite. In that letter, Blue Granite stated it was "refreshing [its] brand *at no cost to [its]*

---

[9] CBRE stands for Coldwell Banker Richard Ellis Group, Inc., an American commercial real estate services and investment firm.

[10] These locations included an office and warehouse in Rock Hill, an office in Anderson, a Water Service Corporation public storage unit, and a Water Service Corporation office.

*customers* to reflect [its] legacy and to showcase [its] new direction." (Emphasis added.) ORS explained:

> [Blue Granite] reasons that legacy brand issues diminished the Company's ability to acquire talented workers in the [West] Columbia market. The Company asserts its rebranding and relocation were aimed to alleviate the Company's talent acquisition issues. The Company represented to its customers that the refreshing of the Company's brand would be at no cost to them and is now contradicting that representation by attempting to pass on to customers relocation and office upgrade costs that were part of its rebranding.
>
> The long-term issues that caused the Company's brand to hinder talent acquisition in the [West] Columbia area [are] not the fault of customers. Nor is the former location of the Company's headquarters in [West] Columbia the cause of any talent acquisition problems. Such problems were caused by the Company, not its location.

ORS pointed out the new office space "contain[ed] many amenities for employees such as the premium location in a historic building, luxury office finishes and appointments, high-end office furniture, large communal spaces, and an overall large footprint relative to the small number of employees." Thus, ORS concluded, the upfit expenses were unreasonable and "difficult to explain to customers that struggle[d] to pay their water and sewer bills."

Likewise, as to the rental expenses, ORS argued (1) the rental expenses were for a "premium" space in the most expensive area of town, rather than a merely functional space in a more modestly-priced area; and (2) the PSC should "thoroughly review[]" the costs associated with "office relocation and office rent . . . to ensure [Blue Granite] took steps to minimize cost[s]" to the ratepayers.

Additionally, ORS took issue with the rental expenses due to inconsistencies in the CBRE data relied upon by Blue Granite in selecting Greenville for its new headquarters location, rather than Columbia or West Columbia. In particular, CBRE scores are inverted, such that a score above 100 indicates a market with overall lower costs than the national average. ORS stated the CBRE scores provided by Blue Granite for all three prospective locations were above 100, with Greenville scoring 105, Columbia scoring 103, and West Columbia scoring 101. Critically, however, in generating the CBRE scores, Blue Granite used different criteria for Greenville and Columbia as compared to West Columbia. Specifically,

Blue Granite "used a 20-mile radius to evaluate market metrics for Columbia and Greenville, whereas [it] used a 10-mile radius for West Columbia." Blue Granite made no attempt to explain why it used different criteria to evaluate the labor market around West Columbia, stating only it "no longer had access to the CBRE database." ORS admitted it would be difficult to say how the different radii would impact the scores, although the smaller 10-mile radius excluded the potential workforces in Blythewood, Chapin, and portions of Lexington, among other municipalities that would have been included if Blue Granite had used a 20-mile radius as it did with Greenville and Columbia. Likewise, ORS stated "that the 2- to 4- point difference in [s]cores d[id] not justify the high cost to relocate [] and upfit the Company's new office [or pass those costs along to Blue Granite's] customers."

Finally, ORS pointed out the incongruity of locating the new office in Greenville, where only 2.6% of Blue Granite's customers lived, rather than in Lexington County or York County, where 43% and 38.6% of Blue Granite's customers lived, respectively. Moreover, apparently, Blue Granite did not even evaluate the CBRE scores for Rock Hill or Anderson, despite already having offices in those locations. Likewise, even in comparing only Greenville, Columbia, and West Columbia, Blue Granite witnesses could not say whether the utility had considered or compared office space prices in the three locations, or only labor statistics.

Ultimately, the PSC concluded that "the Greenville move and its resulting rent and upfit costs are directly and ca[us]ally related to Blue Granite rebranding itself," not mere talent acquisition issues. The PSC cited the testimony of a Blue Granite witness who stated "Blue Granite's relocation and lease of Greenville office space was due to legacy brand issues which were caused by the Company itself," and "attracting talent in the Columbia market has been extremely difficult due to the legacy brand issues in that market." Thus, the PSC found the upfit expenses were unreasonably incurred, stating "Blue Granite's customers should not have to pay the cost to upfit the Greenville office, given the move was necessitated by legacy brand problems the Company created."

The PSC additionally disallowed all rental expenses for the Greenville office ($73,665), explaining those expenses also stemmed from Blue Granite's legacy brand issues. The PSC therefore concluded the rental expenses were unreasonable and denied them in their entirety.

*b. Analysis*

Blue Granite now argues the PSC's disallowance of upfit and rental expenses was arbitrary and capricious and unsupported by substantial evidence in the record. Regarding the upfit expenses, we disagree. However, we agree the complete disallowance of rental expenses amounts to reversible error.

As to the upfit expenses, there is a wealth of evidence in the record supporting the PSC's finding that the headquarters relocation was caused by Blue Granite's self-created "legacy brand issues," and not merely by its employee-retention problems. In fact, as quoted in the PSC's order, Blue Granite itself conceded that its employee-retention problems were caused, at least in part, by the utility's poor reputation in the community. We therefore hold the PSC's finding—that "Blue Granite's customers should not have to pay the cost to upfit the Greenville office, given the move was necessitated by legacy brand problems the Company created"—is supported by substantial evidence.

Similarly, we find the PSC's decision to deny the upfit costs was not arbitrary or capricious, and that the upfit costs were unreasonably incurred. First, Blue Granite promised its customers its rebranding would come at no cost to them. Because there is substantial evidence in the record tending to show the rebranding required moving the utility's headquarters, the upfit costs associated with that headquarters relocation also directly stemmed from the rebranding. The PSC's decision to hold Blue Granite to its promise not to pass along rebranding costs to its customers was in no way whimsical or irrational.

Second, we find the amount of upfit costs incurred was entirely unreasonable, particularly for a small utility such as Blue Granite. Blue Granite chose to move to a historic building that required extensive modernization to turn it into a functional office space. The utility produced no evidence that it attempted to evaluate the cost of other potential office locations in Greenville, much less that other potential locations would have required similar upfit expenses.[11] It is, of course, not unreasonable for Blue Granite to want to provide its executives opulent offices as a job perk. However, as the PSC found, it is unacceptable to pass the costs

---

[11] Likewise, it is unclear from the record why, for example, the office furniture from the West Columbia office could not be reused in the new Greenville office, rather than buying new "high-end office furniture."

associated with that opulence on to ratepayers, who receive no quantifiable benefit from an expenditure of that type. We therefore find the PSC's decision to deny the upfit expenses was not arbitrary or capricious.

As to the rental expenses, we first express our concern that, upon realizing it might be necessary to relocate the utility's headquarters, Blue Granite's management made the decision to rent some of the highest-priced real estate in Greenville—and did so after trying to disassociate itself from the poor public perception of CWS and its business practices. The decision to rebrand the company while simultaneously moving into an unnecessarily-expensive office location is yet another example of Blue Granite self-inflicting wounds to its reputation and requesting its customers reimburse it for the associated expense. We find there is overwhelming evidence in the record to support the PSC's refusal to allow the full amount of the rental expenses requested, as the rental expenses—like the upfit costs—stemmed directly from Blue Granite's poor reputation and subsequent effort to rebrand itself.

However, notwithstanding Blue Granite's regrettable reputation in the community, we find it was arbitrary and capricious for the PSC to entirely deny *all* rental expenses. While the decision of the PSC to disallow the requested $73,665 for rental expenses is supported by the evidence, Blue Granite is entitled to collect from ratepayers some reasonable amount for its headquarters office rental. After all, neither ORS nor the Department object to allowing Blue Granite some sort of reasonable rental rate.

We therefore reverse the PSC's decision to deny all rental expenses for the Greenville office and remand for additional proceedings to determine what a reasonable amount of yearly office rental expenses would be. The burden remains on Blue Granite to establish a reasonable rental allowance. Should Blue Granite continue to rely on CBRE data, Blue Granite must produce comparable CBRE data for Greenville, Columbia, West Columbia, Rock Hill, and Anderson—the three original, prospective locations plus the locations of its two existing offices—including using an identical geographical radii for each city. Moreover, it is incumbent upon Blue Granite to present evidence of reasonable rental amounts for similarly-sized offices, regardless of their location in Greenville or throughout the state. We find it highly likely there are a number of alternate office locations—in Greenville and elsewhere—that would demand significantly less in yearly rental expenses than a historic building on South Main Street.[12] Such a consideration is

---

[12] We find this to be particularly true given that the Greenville office rental expenses are six to seven times the amount of rental expenses for all of Blue

crucial for a utility that serves the public, and for whom the public ordinarily is required to pay for office expenses, rent or otherwise.

We therefore affirm the PSC's disallowance of upfit expenses, but reverse and remand the PSC's disallowance of office rental expenses. On remand, the PSC shall determine a reasonable rental allowance for Blue Granite's headquarters.

## VI.

## Stay of Bond

### a. Underlying Facts

Following the PSC's denial of Blue Granite's motion for reconsideration, the utility filed a motion pursuant to section 58-5-240(D) of the South Carolina Code (2015), which provides, in relevant part, that if the PSC issues a ruling,

> and the utility shall appeal from the order, by filing with the Commission a petition for rehearing, the utility may put the rates requested in its schedule [(i.e., its original application to the PSC for ratemaking)] into effect under bond only during the appeal and until final disposition of the case. *Such bond must be in a reasonable amount approved by the Commission*, with sureties approved by the Commission, conditioned upon the refund . . . to the persons . . . entitled to the amount of the excess, if the rate or rates put into effect are finally determined to be excessive; *or there may be substituted for the bond other arrangements satisfactory to the Commission for the protection of parties interested. . . .*

(Emphasis added.) Via directive—rather than formal, written order—the PSC unanimously voted to approve Blue Granite's proposed appellate bond.

Shortly thereafter, the Department filed a letter with the PSC seeking clarification as to whether Blue Granite was permitted to implement the rates under bond the following month, as the utility had informed its customers it intended to do.

---

Granite's other office locations combined. Additionally, although not directly relevant to the rental expenses issue, it seems equally likely that many alternate office locations in Greenville would have required significantly less in upfit costs as well, demonstrating again that the PSC's decision to deny the upfit expenses was not arbitrary or capricious.

Specifically, the Department was concerned the bond had only been approved via directive, rather than a written order, and therefore the decision might not be final. The Department also raised concerns about the impact the new rates-under-bond would have on Blue Granite's customers during the coronavirus pandemic, and offered alternatives to the immediate implementation of the bond.

The PSC subsequently issued an order staying Blue Granite's ability to implement the higher rates under bond until further notice and scheduled oral arguments on the matter. Three days before the arguments, Blue Granite filed a Conditional Petition for Approval of an Accounting Order. In that petition, Blue Granite stated denying it the ability to implement higher rates under bond would constitute an unconstitutional taking. However, according to Blue Granite,

> *There are two possible remedies to avoid an unconstitutional taking.* The preferred remedy, which would result in the least customer confusion and future rate impact, is to lift the stay and permit the Company to implement the rates under bond for which the Company's customers are on notice. *An alternative remedy is to grant the instant deferral request.*

(Emphasis added.) More specifically, Blue Granite proposed the PSC allow the utility to create a deferred account for a regulatory asset that would increase at a rate of $5,970 per day—the difference between the rates approved in the PSC's order on reconsideration and the rates originally requested in Blue Granite's application. Then, assuming Blue Granite prevailed on appeal, it would be able to recover the amount in the deferred account in a future ratemaking case.

Following oral arguments, the PSC maintained the stay on Blue Granite's ability to implement the higher rates under bond, but granted the utility's alternative request for the creation of a deferred account. Blue Granite moved for reconsideration, arguing:

> Establishment of the regulatory asset authorized by the Commission in the August 31, 2020 directive is an inadequate remedy. . . . [U]nlike implementing rates under bond, future recovery of a regulatory asset is not guaranteed, and it is therefore not a substitute for implementing rates under bond. . . . While the regulatory asset was necessary to protect the Company's potential ability to recover the revenues to which it is entitled, there is no adequate substitute for the Commission issuing final approval of the bond and permitting the Company to implement rates under bond.

The PSC denied the motion for reconsideration, noting "Blue Granite offered the accounting order as a[n] alternative to putting rates in effect under bond, while at the same time, waiving any objection to the continuing Stay."

### b. Analysis

Blue Granite now raises a number of arguments as to why the PSC's decision to stay the bond was improper. However, we find the issue is moot and, therefore, decline to address the merits of the utility's arguments.

Blue Granite proposed two remedies that it originally contended would prevent an unconstitutional taking: (1) implement the rates under bond, or (2) grant the deferred accounting request. The PSC chose the second option. Blue Granite therefore received the relief it requested, and there is nothing further for the Court to decide as to the propriety of one remedy over the other. *See, e.g.*, *State v. Parris*, 387 S.C. 460, 465, 466, 692 S.E.2d 207, 209, 210 (Ct. App. 2010) ("When the defendant receives the relief requested from the trial court, there is no issue for the appellate court to decide." (citing *State v. Sinclair*, 275 S.C. 608, 610, 274 S.E.2d 411, 412 (1981))). The fact that Blue Granite has now changed its mind and decided the deferred accounting option is an "inadequate remedy" is of no consequence. *Cf. McLeod v. Starnes*, 396 S.C. 647, 657, 723 S.E.2d 198, 204 (2012) ("A party may not argue one ground at trial and an alternate ground on appeal." (citation omitted)). We therefore affirm the PSC's decision as to this issue.

## VII.

### The Victory Tweet

As a final matter, Blue Granite discusses a social media post on the PSC's official Twitter account. Specifically, following the issuance of the PSC's final order, the Department posted a "victory tweet" on Twitter, sharing its excitement that Blue Granite failed to prevail on its request for a substantial rate increase, and that the decision was a win for consumers during the midst of the coronavirus pandemic. A gloating victory tweet by a prevailing party may be unbecoming, but it is understandable. Regrettably, the PSC then retweeted the victory tweet on its own official account, reveling in the defeat of Blue Granite's requested rate increase. As a quasi-judicial body, the PSC's retweet was inappropriate. The PSC must not only be fair and impartial, it must be diligent in its duty to avoid the appearance of impropriety. While we are confident that no commissioner of the PSC sanctioned the publication of the victory tweet, we trust the PSC will give more care and

consideration to its social media posts in the future.  Regardless, we have thoroughly reviewed the record and find the PSC's extensive questioning and diligence throughout Blue Granite's ratemaking proceeding reflects its commitment to fairly and impartially decide this application for a rate increase.  When we consider the conscientious manner in which the PSC handled this complicated proceeding, together with its proper and detailed order, we commend the PSC.  We therefore do not find the retweet a basis to reverse the PSC's entire final decision.

## VIII.

In conclusion, we affirm the PSC's decision in part and reverse in part.  Specifically, we affirm the PSC's decisions as to the ROE, storm costs, Greenville office upfit expenses, and stay of an appellate bond.[13]  We reverse the PSC's decision to deny all rental expenses for Blue Granite's new headquarters and remand to the agency for further consideration of what a reasonable rental allowance should be.[14]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**BEATTY, C.J., HEARN, FEW and JAMES, JJ., concur.**

---

[13] While Blue Granite also initially raised a question as to the PSC's treatment of the allowance for non-revenue water, the utility conceded the issue at oral argument.  We therefore affirm the PSC's decision as to Blue Granite's non-revenue water allowance.

[14] Blue Granite challenges three additional issues that were not contested by either respondent before the PSC or on appeal: whether the PSC erred in (1) amortizing its annual water and wastewater service expenses that it purchased in the test year from third parties; (2) disallowing recovery of legal expenses incurred in prior cases filed and then later voluntarily withdrawn by Blue Granite; and (3) disallowing recovery of legal expenses related to administrative law court proceedings dealing with Blue Granite's I-20 system.  The PSC's order does not contain sufficient findings of fact or analysis to allow us to evaluate the merits of these issues on appeal.  As a result, we reverse and remand these issues as well.